# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAMARK JOSE LÓPEZ BELLO,

              Plaintiff,

      v.

BRADLEY T. SMITH, in his official capacity as Acting Director, Office of Foreign Assets Control, *et al.*,

              Defendants.

Civil Action No. 1:21-cv-01727 (RBW)

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

     A.    Statuory And Regulatory Background ........................................................... 3

     B.    Factual Background ....................................................................................... 6

          1.    OFAC's Designation Of El Aissami And Plaintiff............................ 6

          2.    OFAC's Disclosure Of The Unclassified And Non-Privileged Record ................... 8

          3.    Plaintiff's Indictment ...................................................................... 8

     C.    Plaintiff's Complaint ................................................................................... 10

LEGAL STANDARDS OF REVIEW ........................................................................... 10

DISCUSSION ............................................................................................................... 12

I.    OFAC'S Decision Accords With The APA ........................................................... 12

     A.    OFAC's Decision Is Entitled To Substantial Deference ............................. 12

     B.    OFAC's Well-Reasoned Decision Easily Satisfies The APA's Standard..................... 13

     C.    OFAC Permissibly Designated Plaintiff And El Aissami On The Same Day ............. 17

II.    The Designation Of Plaintiff And El Aissami On The Same Day Did Not Deprive Plaintiff Of Fair Notice Under The Fifth Amendment........................................ 22

     A.    Plaintiff Cannot Assert Fifth Amendment Rights ....................................... 22

     B.    Plaintiff's Claim Fails On The Merits......................................................... 25

     C.    Any Error Was Harmless ............................................................................ 29

III.    OFAC Was Not Required To Obtain A Warrant In Connection With Its Designation Of Plaintiff ...................................................................................... 30

     A.    Plaintiff Cannot Assert Fourth Amendment Rights .................................... 30

     B.    OFAC's Decision Did Not Effectuate A Seizure ........................................ 32

     C.    Even if OFAC's Decision Constituted A Seizure, It Was Reasonable ......................... 35

IV.   OFAC Provided Plaintiff Sufficient Notice Of The Reasons For Its Decision ..................... 39

    A.   OFAC's Disclosures Comply With Any Fifth Amendment Obligations ..................... 40

    B.   OFAC's Disclosures Comply With Any APA Obligations ............................................ 43

CONCLUSION ..................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*32 Cty. Sovereignty Comm. v. Dep't of State*,
  292 F.3d 797 (D.C. Cir. 2002) ........................................................................ 23, 32

*Abhe & Svoboda, Inc. v. Chao*,
  508 F.3d 1052 (D.C. Cir. 2007) ............................................................................... 28

*Agency for Int'l Dev. v. All. for Open Soc. Int'l, Inc.*,
  140 S. Ct. 2082 (2020) ....................................................................................... 22, 23

*Al Haramain v. U.S. Dep't of the Treasury*,
  686 F.3d 965 (9th Cir. 2012) ................................................................................... 35

*Am. Immigration Lawyers Ass'n v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998),
  *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) .............................................................. 24, 32

*Amgen Inc. v. Hargan*,
  285 F. Supp. 3d 351 (D.D.C. 2018) ........................................................................ 27

*Ark. Dep't of Hum. Servs. v. Sebelius*,
  818 F. Supp. 2d 107 (D.D.C. 2011) ........................................................................ 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 11, 44

*Bazzi v. Gacki*,
  468 F. Supp. 3d 70 (D.D.C. 2020) ............................................................... 24, 32, 43

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 11

*Boyce Motor Lines, Inc. v. United States*,
  342 U.S. 337 (1952) ................................................................................................ 27

*Camp v. Pitts*,
  411 U.S. 138 (1973) ................................................................................................ 44

*Cassidy v. Chertoff*,
  471 F.3d 67 (2d Cir. 2006) ...................................................................................... 37

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) ......................................................................................... 12, 14

iv

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) .................................................................................... 34, 41

*Fares v. Smith*,
  249 F. Supp. 3d 115 (D.D.C. 2017) .............................................................. 40, 42

*Fares v. Smith*,
  901 F.3d 315 (D.C. Cir. 2018) ................................................................. 7, 40, 42

*FBME Bank Ltd. v. Lew*,
  125 F. Supp. 3d 109 (D.D.C. 2015) ........................................................ 16, 43, 44

*Fla. Gas Transmission Co. v. FERC*,
  604 F.3d 636 (D.C. Cir. 2010) ........................................................................ 16

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ........................................................................................ 12

*Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Rev. Comm'n*,
  108 F.3d 358 (D.C. Cir. 1997) .................................................................... 26, 27

*Fulmen Co. v. OFAC*
  No. 18-2949 (RJL), 2020 WL 1536341 (D.D.C. Mar. 31, 2020) ....................... 23

*Gen. Elec. Co. v. U.S. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) .................................................................... 25, 27

*Gillan v. Winter*,
  474 F.3d 813 (D.C. Cir. 2007) ........................................................................ 18

*Glob. Relief Found., Inc. v. O'Neill*,
  207 F. Supp. 2d 779 (N.D. Ill. 2002),
  *aff'd*, 315 F.3d 748 (7th Cir. 2002) ................................................................ 34

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ........................................................................................ 27

*Griffin v. Wisconsin*,
  483 U.S. 868 (1987) ........................................................................................ 37

*Haig v. Agee*,
  453 U.S 280 (1981) ......................................................................................... 39

*Hinton v. Corr. Corp. of Am.*,
  624 F. Supp. 2d 45 (D.D.C. 2009) .................................................................... 11

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................................... 13, 14, 20, 39

v

*Holy Land Found. for Relief & Dev. v. Ashcroft,
219 F. Supp. 2d 57 (D.D.C. 2002),
aff'd, 333 F.3d 156 (D.C. Cir. 2003)............................................................... passim

*Holy Land Found. for Relief & Dev. v. Ashcroft,
333 F.3d 156 (D.C. Cir. 2003)............................................................... 5, 18, 21

Howmet Corp. v. EPA,
614 F.3d 544 (D.C. Cir. 2010) ............................................................... 25, 27, 28

Ibrahim v. DHS,
669 F.3d 983 (9th Cir. 2012) ............................................................... 24, 32

Islamic Am. Relief Agency v. Gonzales,
477 F.3d 728 (D.C. Cir. 2007) ............................................................... 12, 21, 35

Islamic Am. Relief Agency v. Unidentified FBI Agents,
394 F. Supp. 2d 34 (D.D.C. 2005) ............................................................... 24, 35

Jifry v. FAA,
370 F.3d 1174 (D.C. Cir. 2004) ............................................................... 23, 42

Johnson v. Eisentrager,
339 U.S. 763 (1950)............................................................... 23

Joumaa v. Mnuchin,
798 F. App'x 667 (D.C. Cir. 2020) ............................................................... 16, 21

*Kadi v. Geithner,
42 F. Supp. 3d 1 (D.D.C. 2012),
aff'd, 793 F.3d 106 (D.C. Cir. 2015)............................................................... passim

Khadr v. United States,
529 F.3d 1112 (D.C. Cir. 2008) ............................................................... 10

KindHearts for Charitable Humanitarian Development, Inc. v. Geithner,
647 F. Supp. 2d 857 (N.D. Ohio 2006)............................................................... 35

Klayman v. Obama,
805 F.3d 1148 (D.C. Cir. 2015) ............................................................... 37

Kyllo v. United States,
533 U.S. 27 (2001)............................................................... 38

Lindsey v. City of Sarasota,
No. 8:10-cv-1910, 2011 WL 13302500 (M.D. Fla. Feb. 2, 2011)............................................................... 38

*Markowicz v. Johnson*,
206 F. Supp. 3d 158 (D.D.C. 2016) ........................................................................ 9

*Maryland v. King*,
569 U.S. 435 (2013) ............................................................................................... 37

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ............................................................................................... 25

*Minnesota v. Carter*,
525 U.S. 83 (1998) ................................................................................................. 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................. 12

*N. Air Cargo v. U.S. Postal Serv.*,
674 F.3d 852 (D.C. Cir. 2012) ......................................................................... 17, 18

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) ......................................................................... 23, 41

*Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack*,
681 F.3d 483 (D.C. Cir. 2012) ............................................................................... 38

*Olenga v. Gacki*,
507 F. Supp. 3d 260 (D.D.C. 2020) ............................................................ 16, 33, 44

*Perales v. Reno*,
48 F.3d 1305 (2d Cir. 1995) ................................................................................... 28

*PMD Produce Brokerage Corp. v. USDA*,
234 F.3d 48 (D.C. Cir. 2000) ................................................................................. 28

*Prisology v. Fed. Bureau of Prisons*,
74 F. Supp. 3d 88 (D.D.C. 2014),
*aff'd*, 852 F.3d 1114 (D.C. Cir. 2017) .............................................................. 10, 11

*Rakhimov v. Gacki*,
No. CV 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020),
*appeal dismissed*, No. CV 18-2929 (RJL),
2020 WL 4107145 (D.C. Cir. Jul. 1, 2020) ...................................... 23 33, 43, 44

*Regan v. Wald*,
468 U.S. 222 (1984) ............................................................................................... 22

*Russian Volunteer Fleet v. United States*,
282 U.S. 481 (1931) ............................................................................................... 24

*Safari Club Int'l v. Zinke,*
    878 F.3d 316 (D.C. Cir. 2017) ........................................................... 44

*Satellite Broad. Co. v. FCC,*
    824 F.2d 1 (D.C. Cir. 1987) ............................................................... 26

*Skinner v. Ry. Lab. Executives' Ass'n,*
    489 U.S. 602 (1989) .......................................................................... 36

*Small Refiner Lead Phase-Down Task Force v. U.S. EPA,*
    705 F.2d 506 (D.C. Cir. 1983) ........................................................... 13

*SNR Wireless LicenseCo, LLC v. FCC,*
    868 F.3d 1021 (D.C. Cir. 2017) ......................................................... 26

*Soldal v. Cook County, Ill.,*
    506 U.S. 56 (1992) ............................................................................ 34

*Suburban Air Freight, Inc. v. TSA,*
    716 F.3d 679 (D.C. Cir. 2013) ..................................................... 26, 29

*Sulemane v. Mnuchin,*
    No. CV 16-1822 (TJK), 2019 WL 77428 (D.D.C. Jan. 2, 2019) ............................... 7, 42, 44

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
    413 U.S. 548 (1973) .......................................................................... 27

*United States v. Alkhaldi,*
    No. 4:12-cr-00001-01, 2012 WL 5415787 (E.D. Ark. Sept. 17, 2012) ....................... 32

*United States v. Amirnazmi,*
    645 F.3d 564 (3d Cir. 2011) .............................................................. 34

*United States v. Baboolal,*
    No. 05-cr-215, 2006 WL 1674480 (E.D. Wis. June 16, 2006) ............................... 32

*United States v. Barona,*
    56 F.3d 1087 (9th Cir. 1995) ......................................................... 30, 31

*United States v. Brown,*
    484 F.2d 418 (5th Cir. 1973) ............................................................ 33

*United States v. Cabezas-Montano,*
    949 F.3d 567 (11th Cir. 2020) ........................................................... 31

*United States v. Chem. Found.,*
    272 U.S. 1 (1926) .............................................................................. 15

*United States v. Esparza-Mendoza,*
   265 F. Supp. 2d 1254 (D. Utah 2003),
   *aff'd*, 386 F.3d 953 (10 Cir. 2004) ....................................................................... 31

*United States v. Flores-Montano,*
   541 U.S. 149 (2004)............................................................................................ 36

*United States v. Jacobsen,*
   466 U.S. 109 (1984)............................................................................................ 39

*United States v. Jenkins,*
   984 F.3d 1038 (D.C. Cir. 2021)......................................................................... 38

*United States v. Miller,*
   425 U.S. 435 (1976)............................................................................................ 38

*United States v. Oseguera Gonzalez,*
   No. CR 20-40 (BAH), 2020 WL 6342948 (D.D.C. Oct. 29, 2020)....................... 27

*United States v. Ramsey,*
   431 U.S. 606 (1977)............................................................................................ 36

*United States v. Salvucci,*
   448 U.S. 83 (1980)............................................................................................. 38

*\*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990).......................................................................... 23, 30, 31, 33

*United States v. Verdugo-Urquidez,*
   856 F.2d 1214 (9th Cir. 1988) ........................................................................... 31

*US VC Partners GP LLC v. U.S. Dep't of the Treasury, OFAC,*
   No. 19-cv-6139, 2020 WL 5578503 (S.D.N.Y. Sept. 17, 2020) ........................... 39

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)............................................................................................ 34

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury,*
   750 F. Supp. 2d 150 (D.D.C. 2010) .............................................................. 22, 35

*\*Zevallos v. Obama,*
   10 F. Supp. 3d 111 (D.D.C. 2014),
   *aff'd*, 793 F.3d 106 (D.C. Cir. 2015).......................................................... *passim*

*\*Zevallos v. Obama,*
   793 F.3d 106 (D.C. Cir. 2015)..................................................................... *passim*

**Statutes**

5 U.S.C. § 701 ........................................................................................................................ 2

5 U.S.C. § 706(2) ................................................................................................................. 12

5 U.S.C. § 706(2)(A) ........................................................................................................... 43

5 U.S.C. § 706(2)(B) ........................................................................................................... 10

5 U.S.C. § 706(2)(D) ........................................................................................................... 44

21 U.S.C. § 1901 ................................................................................................................... 1

21 U.S.C. § 1901(a) ............................................................................................................. 29

21 U.S.C. § 1901(a)(3) .......................................................................................................... 4

21 U.S.C. § 1901(a)(4) ............................................................................................... 3, 20, 36

21 U.S.C. § 1902 ...................................................................................................... 17, 20, 33

21 U.S.C. § 1903(b) ........................................................................................................... 4, 5

21 U.S.C. § 1903(i) ............................................................................................................... 7

21 U.S.C. § 1904 ............................................................................................................ 34, 39

21 U.S.C. § 1904(b) ......................................................................................................... 5, 27

21 U.S.C. § 1904(b)(2) ..................................................................................... 7, 13, 18, 41

21 U.S.C. § 1904(b)(3) .................................................................................................... 8, 16

21 U.S.C. § 1904(b)(4) .......................................................................................................... 6

21 U.S.C. § 1904(c) ............................................................................................................... 6

21 U.S.C. § 1906(a) ............................................................................................................. 20

50 U.S.C. §1701 .............................................................................................................. 3, 4

50 U.S.C. § 1701(a) ....................................................................................................... 20, 33

50 U.S.C. § 1702 ................................................................................................................. 34

**The Constitution**

U.S. Const. amend. IV ......................................................................................................... 35

**Rules**

Fed. R. Civ. P. 12(d) ........................................................................................... 11

Fed. R. Civ. P. 56(a) ........................................................................................... 11

Rule 12(b)(1) or Rule 12(b)(6) ............................................................................ 23

**Legislative Materials**

H.R. Rep. No. 106-457 (1999)................................................................. 3, 4, 17, 20

**Regulations and Executive Materials**

31 C.F.R. § 501.603 ............................................................................................ 37

31 C.F.R. § 501.801 ............................................................................................ 39

31 C.F.R. § 501.807 ......................................................................................... 6, 29

31 C.F.R. § 598.312 ............................................................................................ 37

31 C.F.R. § 598.314(b) .................................................................................. 18, 27

31 C.F.R. § 598.803 .............................................................................................. 5

Exec. Order No. 12978, 60 Fed. Reg. 54,579 (Oct. 21, 1995) .............................. 4

63 Fed. Reg. 28,898 (May 27, 1998) ................................................................... 29

80 Fed. Reg. 29,201 (May 15, 2015) ..................................................................... 5

81 Fed. Reg. 68,500 (Oct. 4, 2016)...................................................................... 28

82 Fed. Reg. 11,101 (Feb. 17, 2017) ............................................................. 6, 7, 8

## INTRODUCTION

To address the threat posed by international narcotics trafficking to the national security, foreign policy, and economy of the United States, Congress in 1999 enacted the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. §§ 1901-1908.  Modeled on an Executive Order whose implementation contributed to the downfall of the Cali Cartel, the statute is designed to provide the Executive Branch with the tools to impose economic sanctions against not only those individuals who cultivate and sell narcotic drugs, but also those who finance or otherwise assist such individuals.  As Congress explained, only by blocking the property of a drug kingpin's entire network—including those tasked with laundering the kingpin's drug proceeds or managing his assets—will the government be able to choke off the money supply that funds international narcotics trafficking.

Acting pursuant to the Kingpin Act, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated two individuals as Specially Designated Narcotics Traffickers ("SDNTs") on February 13, 2017: Venezuelan Executive Vice President Tareck Zaidan El Aissami Maddah ("El Aissami") and Plaintiff Samark Jose López Bello.  OFAC designated El Aissami for playing a significant role in international narcotics trafficking by facilitating huge shipments of narcotics from Venezuela—some bound for the United States— and providing protection for other drug traffickers operating in his country.  And based on Plaintiff's role as frontman, financial manager, and money launderer for El Aissami, OFAC designated Plaintiff for providing material assistance, financial support, or goods or services in support of the international narcotics trafficking activities of El Aissami, as well as for acting for or on behalf of El Aissami.  As a result, OFAC blocked Plaintiff's property and interests in property located in the United States or in the possession or control of a U.S. person, totaling at

1

least tens of millions of dollars in assets.  Plaintiff was subsequently indicted in the U.S. District

Court for the Southern District of New York for evading and conspiring to evade the Kingpin

Act, engaging in transactions prohibited by the Kingpin Act, and conspiring to defraud the

United States.

Plaintiff remains a fugitive from the charges pending against him in the Southern District

of New York.  Nevertheless, he now seeks to avail himself of the Judiciary's authority by

challenging OFAC's designation decision pursuant to the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701-706, as well as the Fourth and Fifth Amendments to the Constitution.

The theories he advances, however, are all without merit.

First, Plaintiff contends that OFAC's decision is arbitrary and capricious and exceeds

OFAC's statutory authority.  But Plaintiff's conclusory denials, as well as his complaints about

the timing of OFAC's sanctions, do nothing to undermine the reasonableness of the agency's

decision, which is fully supported by the administrative record.  Second, according to Plaintiff,

OFAC's designation of Plaintiff and El Aissami on the same day violated his rights under the

Fifth Amendment's Due Process Clause.  As a foreign national without substantial contacts with

the United States, however, Plaintiff cannot assert any constitutional due process rights.  And

even if he were able to do so, OFAC's decision in no way deprived Plaintiff of any such rights;

Plaintiff was not entitled to advance warning of OFAC's intent to designate El Aissami, and

OFAC has provided fair notice that narcotics traffickers and their supporters may be designated

on the same day.  Third, Plaintiff incorrectly alleges that the blocking order issued by OFAC

effectuated an unlawful seizure within the meaning of the Fourth Amendment.  This Court has

already rejected an identical claim brought in a sanctions-related challenge, and Plaintiff offers

no basis for the Court to deviate from its prior conclusion, which accords with the historical

context of sanctions actions and the practical effects of blocking orders.  Finally, Plaintiff claims

that OFAC failed to provide him with an adequate explanation of the reasons for its decision.

But whether viewed through the lens of the Constitution or the APA, the information disclosed to

Plaintiff—including a press release, press chart, Federal Register notice, redacted administrative

record, and unclassified and non-privileged summaries of otherwise protected information—

more than adequately apprised Plaintiff of the basis for OFAC's action, which Plaintiff can

contest through an established administrative process.

Accordingly, and for the reasons discussed more fully below, the Court should dismiss

Plaintiff's claims or, in the alternative, grant summary judgment in favor of Defendants.

## BACKGROUND

### A.    Statutory and Regulatory Background

In 1999, Congress enacted the Kingpin Act to address "a national emergency resulting

from the activities of international narcotics traffickers and their organizations."  21 U.S.C.

§ 1901(a)(4).  The statute aims "to protect the national security, foreign policy, and economy of

the United States" from the dangers of the global drug trade by "apply[ing] economic and other

financial sanctions to significant foreign narcotics traffickers and their organizations worldwide."

*Id.* § 1901(b).

Congress modeled the Kingpin Act on the successful application of the International

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, to international

narcotics traffickers in Colombia.  H.R. Rep. No. 106-457 at 42 (1999), *as reprinted in* 1999

U.S.C.C.A.N. 304, 313.  IEEPA authorizes the President to declare a national emergency

resulting from "any unusual and extraordinary threat, which has its source in whole or substantial

part outside the United States, to the national security, foreign policy, or economy of the United

States," and to deal with that threat in part through designations for economic sanctions. 50 U.S.C. § 1701. In October 1995, pursuant to IEEPA, President Clinton issued Executive Order No. 12978, which declared a national emergency based on "the actions of significant foreign narcotics traffickers centered in Colombia, and the unparalleled violence, corruption, and harm that they cause[.]" Exec. Order No. 12978, 60 Fed. Reg. 54,579, 54,579 (Oct. 21, 1995) ("EO 12978"). EO 12978 ordered the blocking of the assets of foreign persons identified in an annex and of foreign persons designated by the Secretary of the Treasury as playing a significant role in such narcotics trafficking, or providing material support to or acting for or on behalf of designated traffickers. *Id.* The Executive Order's implementation is credited with the downfall of the Cali Cartel kingpins. H.R. Rep. No. 106-457 at 43.

The Kingpin Act expressly states that it is Congress's desire to apply similar efforts against international narcotics traffickers worldwide. 21 U.S.C. § 1901(a)(3); *see also* H.R. Rep. No. 106-457 at 42-43. The House Conference Report on the Kingpin Act explains that "[i]f effectively implemented, this strategy will disrupt these criminal organizations and bankrupt their leadership." H.R. Rep. No. 106-457 at 42. To achieve these goals, "[t]he targets of this legislation are not only the drug kingpins, but those involved in their illicit activities, such as: money laundering, acquiring chemical precursors to manufacture narcotics, manufacturing the drugs, transporting narcotics from the drug source countries to the United States, and managing the assets of these criminal enterprises." *Id.* at 43.

Accordingly, the Kingpin Act authorizes the President to identify foreign persons whom he determines to be significant foreign narcotics traffickers, meaning "foreign person[s] that play[] a significant role in international narcotics trafficking." 21 U.S.C. §§ 1903(b), 1907(7); *see also id.* § 1907(3) (defining "narcotics trafficking" as "any illicit activity to cultivate,

produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so").[1]  The statute further authorizes the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, to designate foreign persons "as materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker," *id.* § 1904(b)(2); "as owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker," *id.* § 1904(b)(3); or "as playing a significant role in international narcotics trafficking," *id.* § 1904(b)(4).  The Secretary of the Treasury has delegated designation authority to OFAC.  31 C.F.R. § 598.803.  OFAC's regulations refer to such designated persons, as well as presidentially identified significant foreign narcotics traffickers, as SDNTs.  *Id.* § 598.314.

For all SDNTs, the Kingpin Act operates to block all assets subject to United States jurisdiction that are owned or controlled by the SDNT and all interests in such property.  21 U.S.C. § 1904(b).  OFAC maintains a list of such individuals or entities whose assets are blocked pursuant to the Kingpin Act (as well as other authorities); this list is known as the Specially Designated Nationals and Blocked Persons ("SDN") List.  *See* https://www.treasury.gov/ofac/downloads/sdnlist.pdf.  United States persons and persons within the United States are generally prohibited from engaging in any transaction with or dealing in any property or interests in property of SDNTs, as well as from engaging in any transaction that evades or avoids the

---

[1] On May 15, 2015, the President delegated to the Secretary of the Treasury the functions conferred by 21 U.S.C. § 1903(b), (c), (g), and (h).  80 Fed. Reg. 29,201 (May 15, 2015).

Kingpin Act's prohibitions.  21 U.S.C. § 1904(c).

Once designated, a SDNT may "seek administrative reconsideration" of his designation, or may "assert that the circumstances resulting in the designation no longer apply."  31 C.F.R. § 501.807.  In doing so, the SDNT "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation." *Id.* § 501.807(a).  Additionally, the SDNT may request a meeting with OFAC.  *Id.* § 501.807(c). After conducting a review, OFAC will "provide a written decision" to the SDNT.  *Id.* § 501.807(d).  OFAC's regulations do not limit the number of times a SDNT may seek to challenge his designation administratively.  *See generally id.* § 501.807.

### B.      Factual Background

#### 1.      OFAC's Designation of El Aissami and Plaintiff

On February 13, 2017, OFAC designated Venezuelan national El Aissami as a SDNT under the Kingpin Act for playing a significant role in international narcotics trafficking.  82 Fed. Reg. 11,101, 11,101 (Feb. 17, 2017); *see* 21 U.S.C. § 1904(b)(4).  At the time of his designation, El Aissami was the Executive Vice President of Venezuela.  Admin. R. ("AR") at 0006, 0016.  Based on its multi-year investigation, OFAC determined that El Aissami "facilitated shipments of narcotics from Venezuela, to include control over planes that leave from a Venezuelan air base, as well as control of drug routes through the ports in Venezuela."  *Id.* at 0006.  Further, prior to his tenure as Executive Vice President, El Aissami "oversaw or partially owned narcotics shipments of over 1,000 kilograms from Venezuela on multiple occasions, including those with the final destinations of Mexico and the United States."  *Id.* El Aissami additionally "facilitated, coordinated, and protected other narcotics traffickers operating in

Venezuela[,]" including "receiv[ing] payment for the facilitation of drug shipments belonging to [a] Venezuelan drug kingpin[.]"  *Id.*; *see also id.* (noting El Aissami's ties to the protection of other SDNTs).

Also on February 13, 2017, OFAC designated Plaintiff as a SDNT for materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of El Aissami; and for acting for or on behalf of El Aissami.  82 Fed. Reg. at 11,101; *see* 21 U.S.C. § 1904(b)(2)-(3).  OFAC found that Plaintiff was "acting as a financial manager and front man for El Aissami."  AR at 0025; *see id.* at 0027 (referencing open-source article stating that Plaintiff "is 'linked as a front man' for [El Aissami]"); *id.* at 0006 (describing Plaintiff as "El Aissami's primary frontman"); *id.* at 0658 (identifying Plaintiff as the "frontman," "business representative," and "money manager" for El Aissami); *see also id.* at 0208, 0452, 0602-04.[2]  In that capacity, Plaintiff "launders drug proceeds" for El Aissami.  *Id.* at 0006; *see also id.* at 0658 ("[Plaintiff] is identified as the . . . 'money launderer' for El Aissami").  Given the evidence before the agency, OFAC determined that Plaintiff "is in charge of laundering drug proceeds through Petróleos de Venezuela, S.A. (PDVSA) and organizing the air and maritime cocaine routes to transport cocaine to the Middle East and Asia."  *Id.* at 0658.

El Aissami also uses Plaintiff "to purchase certain assets."  *Id.* at 0006.  Additionally, Plaintiff "handles business arrangements and financial matters for El Aissami, generating significant profits as a result of illegal activity benefiting El Aissami."  *Id.*  For instance, Plaintiff

---

[2] The information described here and below pertains to unclassified and non-privileged information only.  As OFAC's decision was based in part on classified and law enforcement sensitive information, Defendants intend to lodge with the Court, on an *ex parte*, *in camera* basis, a copy of the unredacted record, as well as an affidavit explaining their assertions of the law enforcement privilege, when the parties file the joint appendix required by Local Civil Rule 7(n).  *See Fares v. Smith*, 901 F.3d 315, 319 (D.C. Cir. 2018) (citing 21 U.S.C. § 1903(i)); *Sulemane v. Mnuchin*, No. CV 16-1822 (TJK), 2019 WL 77428, at *5 (D.D.C. Jan. 2, 2019).

"was used by El Aissami to purchase news outlets in Venezuela, which were the most critical of the Chavez regime, with Venezuelan government funds in order to influence public opinion in Venezuela." *Id.* at 0658; *see id.* at 0452. OFAC also determined that Plaintiff manages bonds and conducts deals to benefit El Aissami, and has "procured vehicles in the U.S. that were transported to Venezuela and ultimately went to El Aissami and other Venezuelan government officials." *Id.* at 0658.

In designating Plaintiff, OFAC identified property that Plaintiff owns or controls, including corporate entities and an aircraft. *Id.* at 0038-43. OFAC blocked such property by operation of the Kingpin Act. *Id.* at 0001-03, 0038-43; 82 Fed. Reg. at 11,101-02; *see* 21 U.S.C. § 1904(b)(3).

### 2.   OFAC's Disclosure Of The Unclassified And Non-Privileged Record

In response to Plaintiff's request, on May 22, 2017, OFAC sent Plaintiff a redacted version of the administrative record related to his designation, as well as the U.S. Department of the Treasury press release, press chart, and blocking notices. AR at 0009. OFAC redacted classified and law enforcement sensitive information, as well as other privileged or non-releasable information. *Id.* Nonetheless, the agency noted that it would provide additional information related to its designation decision should such information become releasable. *Id.*

On July 18, 2017, and in accordance with its May 22 letter, OFAC provided Plaintiff with unclassified and non-privileged summaries of otherwise protected information regarding his designation. *Id.* at 0657. As OFAC explained, "[t]his transmission completes OFAC's response to [Plaintiff's] request for releasable information." *Id.*

### 3.   Plaintiff's Indictment

In March of 2019, a grand jury in the Southern District of New York indicted Plaintiff, El

Aissami, and others for evading and conspiring to evade the Kingpin Act.  Superseding

Indictment ¶¶ 1-23, 26-27, 30-31, ECF No. 15, *United States v. El Aissami*, No. 19-cr-144

(S.D.N.Y.).  The grand jury also charged these individuals, including Plaintiff, with engaging in

transactions prohibited by the Kingpin Act.  *Id.* ¶¶ 24-25, 28-29.  In a superseding indictment

returned in March of 2020, the grand jury additionally charged Plaintiff, among others, with

conspiring to defraud the United States.  Superseding Indictment ¶¶ 1-24, ECF No. 67, *United*

*States v. El Aissami*, No. 19-cr-144 (S.D.N.Y.).

       According to the Superseding Indictment, Plaintiff illegally sought to circumvent

OFAC's sanctions almost immediately after being designated under the Kingpin Act.  *Id.* ¶ 1.

For instance, Plaintiff "used U.S.-based companies to charter private flights, including at times

on U.S. registered aircraft, for [El Aissami] and [Plaintiff] in connection with travel in and

between, among other places, Venezuela, Russia, Turkey, and the Dominican Republic."  *Id.* ¶ 3.

Plaintiff similarly "paid U.S. persons and U.S.-based companies for private flights and other

flight-related services by, among other means, using associates to deliver bulk cash in Caracas,

Venezuela to be smuggled into the United States."  *Id.* ¶ 4.

       Plaintiff has not returned from Venezuela to face these charges.  In light of his illicit

activities related to international narcotics trafficking and money laundering, Plaintiff remains on

U.S. Immigration and Customs Enforcement's list of most wanted fugitives,

https://www.ice.gov/most-wanted; https://www.ice.gov/news/releases/former-vice-president-

venezuela-tareck-el-aissami-and-venezuelan-businessman-samark; *see also Markowicz v.*

*Johnson*, 206 F. Supp. 3d 158, 161 n.2 (D.D.C. 2016) (noting that a court may take judicial

notice of information posted on an agency's website).

### C.      Plaintiff's Complaint

Plaintiff filed this action on June 29, 2021, advancing multiple theories concerning

OFAC's decision to designate him as a SDNT.  Compl. for Decl. & Inj. Relief ¶¶ 126-47, ECF

No. 1 ("Compl.").  First, Plaintiff contends that OFAC's decision was arbitrary and capricious

and exceeded its statutory authority because it "failed to identify conduct which demonstrates"

that Plaintiff meets the criteria for designation under the Kingpin Act.  *Id.* ¶¶ 126-31 (Counts I

and II).  Second, according to Plaintiff, OFAC's imposition of sanctions against Plaintiff and El

Aissami on the same day failed to provide "fair notice of conduct that is prohibited or otherwise

sanctionable or that is required by law[,]" in contravention of his purported rights under the Fifth

Amendment.  *Id.* ¶¶ 132-34 (Count III); *see also id.* ¶¶ 139-40 (asserting similar claim in Count

V pursuant to 5 U.S.C. § 706(2)(B)).  Third, Plaintiff alleges that OFAC's decision effectuated

an unlawful seizure in violation of his Fourth Amendment rights.  *Id.* ¶¶ 135-37 (Count IV); *see*

*also id.* ¶¶ 139, 141 (asserting similar claim in Count V pursuant to 5 U.S.C. § 706(2)(B)).

Finally, relying on both the Fifth Amendment and § 706(2)(A) and (D) of the APA, Plaintiff

claims that OFAC failed to provide adequate notice of its reasons for the agency's decision.  *Id*.

¶¶ 142-47 (Counts VI and VII).  Plaintiff seeks a variety of declaratory and injunctive relief,

including an order to vacate and rescind his designation.  *Id*. at 33-34, Relief Requested.

### LEGAL STANDARDS OF REVIEW

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing

the court's subject-matter jurisdiction.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C.

Cir. 2008).  "Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is

lacking, then the dispute is not a proper case or controversy under Article III, and federal courts

do not have subject matter jurisdiction to decide the case."  *Prisology v. Fed. Bureau of Prisons*,

74 F. Supp. 3d 88, 93 (D.D.C. 2014), *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (internal citations omitted). For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein and documents upon which the complaint relies. *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009).

Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56 where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion. Fed. R. Civ. P. 12(d). Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of an APA claim, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015))); *see also id.* (noting the court's "'limited role . . . in reviewing the administrative record'" (citations omitted)).

**DISCUSSION**

I.    **OFAC's Decision Accords With The APA**

    A.    **OFAC's Decision Is Entitled To Substantial Deference**

When evaluating claims brought pursuant to the APA, a court reviews an agency decision

based on the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)

(citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).  A court should

uphold an agency decision unless it is "(A) arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or

immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right; [or] (D) without observance of procedure required by law[.]"  5 U.S.C. § 706(2).

Under this deferential standard, the agency's decision is presumed valid, and a court

reviews only whether that decision "was based on a consideration of the relevant factors and

whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park*, 401 U.S.

at 416.  An agency's decision may be deemed arbitrary and capricious only in circumstances

where the agency "has relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency," or its decision "is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs.

Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The court may not

"substitute its judgment for that of the agency."  *Id.*  Rather, the agency's decision should be

affirmed as long as it is supported by a rational basis.  *Id.*

This deference is further heightened in cases, such as this one, that involve national

security and foreign affairs.  *See, e.g.*, *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734

(D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign

policy, and administrative law—is extremely deferential."); *Zevallos*, 10 F. Supp. 3d at 119

(recognizing additional deference beyond that typically accorded to an agency under the APA);

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002)

("Blocking orders are an important component of U.S. foreign policy, and the President's choice

of this tool to combat terrorism is entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C.

Cir. 2003).  Moreover, this heightened deference is warranted even in the context of

constitutional claims.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).

> **B.       OFAC's Well-Reasoned Decision Easily Satisfies The APA's Standard**

Applying the highly deferential standard of review required here, the Court should

uphold OFAC's decision to designate Plaintiff.  The unclassified and non-privileged portions of

the administrative record alone provide a rational basis for the agency's determination that

Plaintiff meets the criteria for designation under the Kingpin Act, 21 U.S.C. § 1904(b)(2)-(3).[3]

OFAC's determination pursuant to § 1904(b)(2)—that Plaintiff "materially assist[s] in, or

provid[es] financial or technological support for or to, or provid[es] goods or services in support

of, the international narcotics trafficking activities of" El Aissami—"meets the 'minimal

standards of rationality,' and therefore must be upheld."  *See Holy Land Found.*, 219 F. Supp. 2d

at 74 (quoting *Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 521

(D.C. Cir. 1983)).  The evidence available to OFAC indicated that Plaintiff "is a key frontman

for El Aissami and in that capacity launders drug proceeds."  AR at 0006; *see id.* at 0658

("[Plaintiff] is identified as the . . . 'money launderer' for El Aissami.").  Consistent with this

reporting, information considered by OFAC established that Plaintiff "is in charge of laundering

---

[3] As noted above, the classified and privileged portions of the record provide additional information considered by OFAC in connection with its decision.

drug proceeds through Petróleos de Venezuela, S.A. (PDVSA) and organizing the air and maritime cocaine routes to transport cocaine to the Middle East and Asia." *Id.* at 0658. These findings readily meet the APA's standard, particularly given the deference owed to OFAC in light of the national security and foreign policy implications of this case.

As to OFAC's conclusion that Plaintiff acts for or on behalf of El Aissami, 21 U.S.C. § 1904(b)(3), OFAC relied on the above-referenced reporting that Plaintiff "launders drug proceeds" for El Aissami and "is identified as the . . . 'money launderer' for El Aissami." AR at 0006, 0658.[4] The agency also considered information that Plaintiff is El Aissami's "financial manager," "front man," "business representative," and "money manager[.]" *Id.* at 0006, 0025, 0027, 0208, 0452, 0658. In that capacity, Plaintiff "purchase[s] certain assets" on behalf of El Aissami, and also "handles business arrangements and financial matters for El Aissami, generating significant profits as a result of illegal activity benefiting El Aissami." *Id.* at 0006; *see also id.* at 0452, 0602-04. Specifically, Plaintiff "was used by El Aissami to purchase news outlets in Venezuela, which were the most critical of the Chavez regime, with Venezuelan government funds in order to influence public opinion in Venezuela." *Id.* at 0658; *see id.* at 0452. Additionally, the evidence before the agency demonstrated that Plaintiff manages bonds and conducts deals to benefit El Aissami, and has "procured vehicles in the U.S. that were transported to Venezuela and ultimately went to El Aissami and other Venezuelan government officials." *Id.* at 0658. Such evidence amply supports OFAC's decision to designate Plaintiff for acting for or on behalf of El Aissami pursuant to § 1904(b)(3).

Plaintiff's arguments do not compel a different conclusion. Aside from Plaintiff's theory

---

[4] Although such activities pertain to El Aissami's narcotics trafficking, no such nexus is required for a designation pursuant to § 1904(b)(3) of the Kingpin Act. This reflects the reality that "[m]oney is fungible," *Humanitarian Law Project*, 561 U.S. at 31, 37, and acting for a drug kingpin even in matters outside the narcotics trafficking context frees up resources that can be deployed by the kingpin for illicit purposes.

that OFAC could not designate him and El Aissami on the same day—addressed in greater detail in Part I.C, *infra*—Plaintiff appears to challenge OFAC's decision as arbitrary and capricious on three separate grounds.  Each fails.

First, Plaintiff alleges throughout his Complaint that he disagrees with OFAC's findings. *E.g.*, Compl. ¶ 3 ("OFAC's allegations and its supporting evidence are false, if not entirely fabricated.").  But his disagreement is insufficient to establish that OFAC's designation decision was arbitrary and capricious, *see Zevallos*, 793 F.3d at 114, and Plaintiff provides no reason to doubt the agency's fact-finding process, which prior decisions in this Circuit have upheld against similar challenges, *e.g.*, *Holy Land Found.*, 333 F.3d at 162 ("[I]t is clear that the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations."); *Kadi*, 42 F. Supp. 3d at 12-23 (holding OFAC's designation decision was supported by substantial evidence, notwithstanding the plaintiff's argument that "the evidence underlying OFAC's decision is unreliable").  And Plaintiff's baseless accusation that the government has "fabricated" evidence is patently insufficient to overcome the presumption of regularity that the Court must grant OFAC.  *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926); *see also Holy Land Found.*, 219 F. Supp. 2d at 65-66.

Second, and similarly, Plaintiff suggests that the Court should set aside OFAC's decision because the agency did not expressly assess the credibility of certain sources, including an open-source media article.  Compl. ¶¶ 38, 79.  The D.C. Circuit, however, has already rejected an argument that "Treasury is not entitled to rely on 'unverified open source materials' like news media reports to justify designation decisions under the Kingpin Act." *Zevallos*, 793 F.3d at 112-13.  Nor must an agency expressly assign credibility determinations to every source of information in order to survive an APA challenge; rather, the salient question is whether "the

evidence OFAC relied upon as a whole 'adequately supports its ultimate decision,'" *Zevallos*, 10 F. Supp. 3d at 123 n.9 (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010))—which, for the reasons discussed above, it does here.  *See also Olenga v. Gacki*, 507 F. Supp. 3d 260, 279-80 (D.D.C. 2020) (explaining that "an agency's decision . . . need not be a model of analytic precision to survive a challenge, and a reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (cleaned up)).

Third, Plaintiff complains that the unclassified and non-privileged summaries provided by OFAC are insufficiently detailed, including because they do not, in Plaintiff's view, describe a sufficient nexus between Plaintiff's conduct and El Aissami's international narcotics trafficking activities.  Compl. ¶¶ 74-80.  Yet Plaintiff overlooks the fact that these summaries— which OFAC was not required to provide, *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 119 n.2 (D.D.C. 2015)—were distilled from protected information, and additional disclosure was not possible, AR at 0657-58.  Further, OFAC need not, as Plaintiff suggests, establish some nexus between his activities and El Aissami's narcotics trafficking in order to designate Plaintiff as a SDNT pursuant to 21 U.S.C. § 1904(b)(3).  Again, that provision of the Kingpin Act, by its terms, authorizes designation of any foreign person provided he is found to be "directed by, or acting for or on behalf of, a significant foreign narcotics trafficker"—without requiring the former to be engaging in narcotics trafficking himself.  *See* 21 U.S.C. § 1904(b)(3).  In any event, OFAC may reasonably decide to designate an individual under § 1904(b)(2), which does contemplate a link to international narcotics trafficking, even though each discrete piece of disclosed evidence does not establish such a nexus.  *See Joumaa v. Mnuchin*, 798 F. App'x 667, 668 (D.C. Cir. 2020) ("While OFAC did not link *every* instance of money laundering to the drug trade, nothing in the Kingpin Act requires it to do so.  We do not ask whether every piece of

evidence 'standing alone' could support OFAC's decision, but whether 'all the evidence together provides [an] adequate basis.'" (quoting *Zevallos*, 793 F.3d at 113-14)).  And for the reasons discussed above, OFAC's determinations under both § 1904(b)(2) and § 1904(b)(3) are supported by the totality of evidence, and are also consistent with Congress's goal of dismantling a drug trafficker's entire organization.  *See* 21 U.S.C. § 1902; H.R. Rep. No. 106-457 at 42-43.[5]

### C.    OFAC Permissibly Designated Plaintiff And El Aissami On The Same Day

Plaintiff's APA claims appear to be based primarily on OFAC's decision to designate both Plaintiff and El Aissami on the same day.  According to Plaintiff, OFAC's decision is arbitrary and capricious because El Aissami "first became an SDNT on the same date as [Plaintiff,]" and "[f]or this reason, the factual basis of [Plaintiff's] designation is necessarily devoid of any findings that" Plaintiff meets the criteria for designation under the Kingpin Act. Compl. ¶ 22; *see id.* ¶¶ 5, 44, 128.  Plaintiff similarly argues that in designating Plaintiff and El Aissami on the same day and "as part of the same designation action[,]" OFAC exceeded its statutory authority.  *Id.* ¶¶ 4-5, 131.  In other words, Plaintiff asserts that OFAC can designate him for materially assisting, providing support or services to, or acting for or on behalf of El Aissami only if OFAC first designates El Aissami under the Kingpin Act, and subsequent to that designation Plaintiff continues to materially assist, provide support or services to, or act for or on behalf of El Aissami.  This argument is without merit.

As an initial matter, the Kingpin Act does not speak to the timing or sequencing of OFAC's sanctions-related decisions.  The statute provides in relevant part that the government can impose sanctions against a foreign person if that person is materially assisting, providing

---

[5] If the Court were to find to the contrary, the proper remedy would be to remand to OFAC—not order Defendants to rescind the designation, as Plaintiff asserts, Compl., Relief Requested.  *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012).

support or services to, or acting for or on behalf of "foreign persons designated by the Secretary

of the Treasury pursuant to [§ 1904.]"  21 U.S.C. § 1904(b)(2)-(3).  While designation of a

separate foreign person is required, *prior designation* is not.  *See id.*  The statute similarly does

not limit OFAC to reliance only on conduct that took place after the designation of the kingpin.

*See id.*  Rather, the statutory text reflects the broad discretion conferred by Congress on the

Executive Branch to effectuate the purpose of the Kingpin Act, *id.* § 1902, and does not lend

itself to any temporal limitation.  *Cf. Holy Land Found.*, 333 F.3d at 162 (rejecting claim that

OFAC exceeded its authority based in part on "[t]he plain text of [IEEPA,]" which "imposes no

limit on the scope of the interest").  "Congress was certainly free to eliminate this discretion by

writing a specific timeline into the statute, but it has chosen not to restrain the [Executive

Branch]" regarding the timing of designations.  *Cf. Gillan v. Winter*, 474 F.3d 813, 819 (D.C.

Cir. 2007).

      Nor do OFAC's implementing regulations restrict the Executive Branch's authority in the

manner suggested by Plaintiff.  OFAC has explained that "[t]he term specially designated

narcotics trafficker means[,]" in part, "[f]oreign persons . . . found to be: (1) Materially assisting

in, or providing financial or technological support for or to, or providing goods or services in

support of, the international narcotics trafficking activities of a specially designated narcotics

trafficker; [and] (2) Owned, controlled, or directed by, or acting for or on behalf of, a specially

designated narcotics trafficker[.]"  31 C.F.R. § 598.314(b), cited in Compl. ¶ 21.  This regulation

faithfully adheres to the statutory requirement that OFAC may not designate a foreign person

under the Kingpin Act for materially assisting, providing support or services to, or acting for or

on behalf of a separate foreign person who does not himself meet the criteria for designation.

The regulation does not, however, indicate that OFAC is prohibited from designating on the

same day a prominent international narcotics trafficker and his frontman.

Plaintiff may prefer that OFAC issue its sanctions in a particular sequence or at particular intervals—in this case, for example, by first designating El Aissami and then allowing Plaintiff some undefined amount of time to consider his next steps.  *See* Compl. ¶ 3 (asserting that Plaintiff "is certainly incapable of providing support to activities that he was not aware of or involved in").  But there is good reason that neither the Kingpin Act nor OFAC's regulations require the agency to do so.  In deciding whom to sanction, and when, OFAC must account for the possibility that individuals with ties to a newly designated narcotics trafficker will illicitly move money on behalf of that trafficker or in furtherance of his nefarious operations.  *Cf. Zevallos*, 793 F.3d at 116 ("[P]roviding notice before blocking the assets of international narcotics traffickers would create a substantial risk of asset flight."); *Holy Land Found.*, 219 F. Supp. 2d at 77 (OFAC was not required to provide pre-deprivation notice and hearing in part because "prompt action by the Government was necessary to protect against the transfer of assets subject to the blocking order[,]" and "any delay or pre-blocking notice would afford a designated entity the opportunity to transfer, spend, or conceal its assets, thereby making the IEEPA sanctions program virtually meaningless.").  By freezing the assets of both El Aissami and Plaintiff on the same day, the government prevented El Aissami from indirectly carrying out his illicit activities with assets under the control of Plaintiff—a self-described sophisticated businessman with substantial means.  *See* Compl. ¶¶ 3, 6, 85-115 (alleging Plaintiff "is an international businessman" with at least tens of millions of dollars in assets subject to OFAC's blocking order, as well as interests in foreign entities with more than $100 million in assets).

That strategy is entirely consistent with the purpose of the Kingpin Act, which is designed to address the "national emergency resulting from the activities of international

narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States."  21 U.S.C. § 1901(a)(4).  To that end, Congress did not seek to allow a window of compliance for the affiliates of drug kingpins, but rather to arm the Executive Branch with the tools needed to swiftly dismantle their entire trafficking networks. H.R. Rep. No. 106-457 at 42-43; 21 U.S.C. § 1902; *cf.* 50 U.S.C. § 1701(a) (authorizing President to declare a national emergency to deal with certain "unusual and extraordinary threat[s]").  By contrast, to require that OFAC wait to designate individuals assisting, supporting, or acting for an international narcotics trafficker in the hope that they will cut off ties to that trafficker—rather than find ways to circumvent the blocking order—is not only "impractical," but "would likely cripple the Kingpin Act."  *Zevallos*, 793 F.3d at 117; *cf. Holy Land Found.*, 219 F. Supp. 2d at 74 n.28 ("Executive Branch decisions to designate an entity as a terrorist are complex and involve significant political ramifications.  Accordingly, the Court must defer to the Executive's discretion on the timing of those foreign policy and national security decisions.").  It is likewise imperative that OFAC be able to address the apparently innocuous activity by a kingpin's supporter, especially as money is fungible.  *Cf. Humanitarian Law Project*, 561 U.S. at 31, 37; *Kadi*, 42 F. Supp. 3d at 35 ("Because money is fungible, even allowing for good-intentioned financial support to organizations and individuals involved in terrorism would be problematic, as organizations could free up other resources to be used towards violent terrorist objectives.").

Moreover, underlying Plaintiff's argument is the incorrect premise that OFAC may only designate individuals who knowingly engage in sanctionable conduct.  *See* Compl. ¶ 3.  The Kingpin Act and OFAC's regulations impose no such requirement.  *See* 21 U.S.C. § 1906(a) (authorizing criminal penalties for "willful[]" or "knowing[]" violations); *cf. Kadi*, 42 F. Supp.

3d at 18 ("Kadi's intent in donating to terrorist causes or to SDGTs is not relevant here."). Indeed, contrary to Plaintiff's theory, courts have held that OFAC can reasonably consider the "genesis and history" of a sanctions target, and may impose sanctions for conduct that predates other relevant designations or even the issuance of the sanctions authority itself.  *Holy Land Found.*, 333 F.3d at 162; *Joumaa*, 798 F. App'x at 669; *Islamic Am. Relief Agency*, 477 F.3d at 734; *Kadi*, 42 F. Supp. 3d at 18-21.

    *Kadi* is especially instructive.  In that case, the court rejected the plaintiff's arguments that OFAC lacked substantial evidence and exceeded its authority in reaching its designation decision.  42 F. Supp. 3d at 11-24.  In doing so, the court determined that the record supported the agency's conclusion that the plaintiff provided financial support to an individual designated *on the same day* as the plaintiff.  *Id.* at 18, 20-21.  The court declined to reach a different result based on the plaintiff's assertions that the transactions cited by OFAC were innocuous.  *Id.* Additionally, OFAC reasonably found that the plaintiff supported terrorism through his transfers to a charitable organization, notwithstanding the plaintiff's claim that his involvement with the organization's personnel "predated their designations[.]"  *Id.* at 13-18.  As in *Kadi*, the Court here should conclude that OFAC reasonably designated Plaintiff based on substantial evidence that he materially assists, provides support or services to, and acts for or on behalf of El Aissami, whom OFAC has also determined meets the criteria for designation as a SDNT; it is immaterial that OFAC designated Plaintiff on the same day as El Aissami instead of a day later, and Plaintiff's alleged ignorance that he engaged in sanctionable conduct is not a viable defense.

    In short, OFAC assessed that both El Aissami and Plaintiff meet the criteria for designation under the Kingpin Act, and further determined that designating them on the same day was consistent with the national security and foreign policy interests of the United States.

The Court should defer to OFAC's decision, which accords with the requirements of the Kingpin Act and the APA. *Cf. Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 157-58 (D.D.C. 2010) ("[T]his Court declines to adjudicate such matters of strategy and tactics relating to the conduct of foreign policy, which 'are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984)).

## II.     The Designation Of Plaintiff And El Aissami On The Same Day Did Not Deprive Plaintiff Of Fair Notice Under The Fifth Amendment

In Count III of his Complaint, Plaintiff reframes his argument about the timing of OFAC's decision as a Fifth Amendment claim, asserting that Defendants "failed to provide [him] fair notice" that materially assisting, providing support or services to, or acting for or on behalf of El Aissami constituted sanctionable conduct.  Compl. ¶¶ 132-34; *see also id.* ¶ 140 (raising similar claim under 5 U.S.C. § 706(2)(B)).  But as a foreign person without substantial contacts with the United States, Plaintiff may not assert any Fifth Amendment rights.  And in any event, OFAC's decision accords with any process that Plaintiff may be due, particularly given the language of the Kingpin Act itself and the national security and foreign policy interests at stake.

### A.     Plaintiff Cannot Assert Fifth Amendment Rights

"[I]t is long settled as a matter of American constitutional law that foreign citizens outside U. S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc. Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) (citations omitted).  While the Supreme Court has recognized that "foreign citizens *in the United States* may enjoy certain constitutional rights—to take just one example, the right to due process in a criminal trial . . . the Court has not allowed foreign citizens outside the United States or such U.S. territory to assert rights under the U.S. Constitution." *Id.* (emphasis in original; citations omitted); *see also*

*Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950) ("[I]n extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act.").  In accordance with this principle, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990); *accord Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections.").[6]

Plaintiff is neither a U.S. citizen nor resident.  Compl. ¶ 11; *see also* AR at 0028-29.  This lack of physical presence indicates that Plaintiff may not avail himself of the Fifth Amendment.  *See Agency for Int'l Dev.*, 140 S. Ct. at 2086; *Verdugo-Urquidez*, 494 U.S. at 271.  Moreover, Plaintiff's financial interests, including alleged U.S.-based bank accounts, commercial property, vessels, and automobiles, Compl. ¶¶ 86-112, cannot compensate for this lack of physical presence, as mere property ownership—in the absence of both physical presence *and* a substantial, voluntary connection to this country—is insufficient under *Verdugo*.  *See also* 32 *Cty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (rejecting the petitioners' claim to constitutional rights where they "demonstrated neither a property interest nor a presence in this country"); *compare Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201 (D.C. Cir. 2001) (concluding that two Iranian organizations could bring a Fifth Amendment due process challenge because they had an "overt presence within the National

---

[6] Courts have been divided about whether to dismiss foreign nationals' Fifth Amendment claims for insufficient contacts under Rule 12(b)(1) or Rule 12(b)(6).  *Compare Rakhimov v. Gacki*, No. CV 19-2554 (JEB), 2020 WL 1911561, at *4-5 (D.D.C. Apr. 20, 2020), *appeal dismissed*, No. 20-cv-5121, 2020 WL 4107145 (D.C. Cir. July 1, 2020), *with Fulmen Co. v. OFAC*, No. CV 18-2949 (RJL), 2020 WL 1536341, at *5 (D.D.C. Mar. 31, 2020).

Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank account"). Simply put, Supreme Court precedent does not allow Plaintiff to purchase constitutional rights.[7]

Nor can Plaintiff shore up these deficiencies by alleging that he, at some undefined time, "held two U.S. visas"; has children who are U.S. citizens, including a daughter who, at some undefined time, "studied in the United States"; has a wife who, again at some undefined time, "was a resident under a 'temporary worker' visa"; and he, at some undefined time, "held memberships in social clubs in the United States," Compl. ¶¶ 120-21. *See Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 60 n.17 (D.D.C. 1998) ("Although the complaint alleges that Ms. Perez 'regularly comes to the United States to visit her ill daughter and grandchild,' . . . this does not rise to the level of a substantial connection."), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000); *cf. Ibrahim v. DHS*, 669 F.3d 983, 995-97 (9th Cir. 2012) (explaining that the plaintiff developed sufficient contacts in part because her presence abroad was attributed to her work within the United States and was meant to "further . . . her connection to the United States"; and emphasizing that "[w]e do not hold that tourists, business visitors, and all student visa holders have the same connection to the United States as [the plaintiff]"). His Fifth Amendment claim thus should be dismissed.[8]

---

[7] In *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491-92 (1931), the Supreme Court held that a non-resident foreign national could assert a claim under the Takings Clause as to property within the territorial boundaries of the United States. Plaintiff here does not assert a Takings claim, nor could he, as this Court has previously explained. *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 51 (D.D.C. 2005) (Walton, J.) ("First, it appears that this Court lacks subject matter jurisdiction over the plaintiff's Fifth Amendment claim, as this is a claim properly brought before the United States Court of Federal Claims pursuant to the Tucker Act. . . . Moreover, to the extent that the plaintiff seeks to challenge the blocking of assets pursuant to an Executive Order, such an order is not, as a matter of law, a takings within the meaning of the Fifth Amendment.").

[8] Plaintiff cannot avoid dismissal by laundering his Fifth Amendment claim through the APA, Compl. ¶¶ 139-40. *See Bazzi v. Gacki*, 468 F. Supp. 3d 70, 82 (D.D.C. 2020) (explaining that where Plaintiff could not assert constitutional rights, "the APA does not provide him separate constitutional-equivalent protection").

**B.      Plaintiff's Claim Fails On The Merits**

Even assuming Plaintiff could assert rights under the Fifth Amendment, his claim would still fail.  Plaintiff argues that the Due Process Clause prohibited OFAC from imposing sanctions against him because it had not previously designated El Aissami as a SDNT.  Compl. ¶ 134. That theory is based on a misunderstanding of the so-called "fair notice" doctrine.  *See id.*

The D.C. Circuit has held that "[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability."  *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995).  Contrary to Plaintiff's argument, however, fair notice does not require that an agency provide advance warning of specific actions it may take; rather, the focus is on whether the agency has provided "adequate notice of the substance of the rule" being applied.  *Howmet Corp. v. EPA*, 614 F.3d 544, 553 (D.C. Cir. 2010) (citation omitted).  Accordingly, the Court should reject Plaintiff's novel theory that the fair notice doctrine precludes OFAC from designating Plaintiff and El Aissami as SDNTs on the same day.

Plaintiff's argument suffers from yet another fundamental flaw.  The fair notice doctrine is rooted in cases where pre-deprivation notice is constitutionally mandated.  *E.g.*, *Gen. Elec.*, 53 F.3d at 1328-29.  But again, and as recognized by both courts and Congress, pre-deprivation notice is not required in the context of OFAC's sanctions actions, where the government seeks to further its compelling national security and foreign policy interests while minimizing the potential for asset flight.  *Zevallos*, 793 F.3d at 116; H.R. Rep. No. 106-457 at 47; *see also Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("Due process is flexible and calls for such procedural protections as the particular situation demands.").  Extending the fair notice doctrine

to require the type of advance warning contemplated by Plaintiff would defeat the central

purpose of the Kingpin Act, namely to facilitate coordinated action to dismantle international

drug trafficking networks.  *See Ark. Dep't of Hum. Servs. v. Sebelius*, 818 F. Supp. 2d 107, 122

(D.D.C. 2011) (explaining that the doctrine should not apply where "agencies would be unable to

administer their regulations efficiently").  *Cf. Freeman United Coal Min. Co. v. Fed. Mine Safety*

*& Health Rev. Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997) (courts should not apply fair notice

doctrine where doing so would "open[] up large loopholes allowing conduct which should be

regulated to escape regulation" (citation omitted)).

Plaintiff fares no better in alternatively arguing that OFAC violated the Fifth Amendment

by "fail[ing] to provide [him] notice of its interpretation" that the Kingpin Act permits

designations of narcotics traffickers and their supporters on the same day.  Compl. ¶ 140.  An

agency's interpretation provides fair notice "if it allows regulated parties to 'identify, with

ascertainable certainty, the standards with which the agency expects them to conform.'"  *SNR*

*Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017) (citation omitted).

Applying this principle, courts have "vacated an enforcement action on notice grounds" in a

"very limited set of cases," such as where an "agency's interpretation was so far from a

reasonable person's understanding of the regulations that they could not have fairly informed

regulated parties of the agency's perspective," or where the agency, without fair warning,

"changed course with respect to its interpretation of a governing statute."  *Suburban Air Freight,*

*Inc. v. TSA*, 716 F.3d 679, 684 (D.C. Cir. 2013) (cleaned up); *see also Satellite Broad. Co. v.*

*FCC*, 824 F.2d 1, 2, 4 (D.C. Cir. 1987) (agency failed to provide fair notice where rules were

applied "in a baffling and inconsistent fashion").

OFAC's interpretation of the Kingpin Act does not fall within this "very limited set."  As

explained in Part I.C, *supra*, both the Kingpin Act and OFAC's regulation unambiguously set forth the relevant standard of conduct that can result in designation, including by using ordinary language such as "providing financial or technological support for" and "acting for or on behalf of," as well as defined terms such as "Specially Designated Narcotics Trafficker."  21 U.S.C. § 1904(b); 31 C.F.R. § 598.314(b).  *Cf. United States v. Oseguera Gonzalez*, No. CR 20-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020) (rejecting claim that Kingpin Act is unconstitutionally vague, and explaining that "the terms 'transaction' and 'dealing' are everyday terms with widely understood ordinary meanings that define concrete, measurable actions"); *Kadi*, 42 Supp. 3d at 39-42 (terms "Specially Designated Global Terrorist," "material support," and "services" are not unconstitutionally vague).  Simply because those provisions "embody 'flexibility and reasonable breadth'"—as they must, given OFAC's mission to respond adroitly to a wide range of illicit conduct—does not render them constitutionally suspect.  *Freeman United Coal Min.*, 108 F.3d at 362 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)); *see also, e.g.*, *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 579 (1973); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952).

Moreover, through its informal adjudications over the past two decades, OFAC has provided the public consistent notice that it interprets the Kingpin Act to permit simultaneous designations of traffickers and their supporters.  *See Amgen Inc. v. Hargan*, 285 F. Supp. 3d 351, 378 (D.D.C. 2018) (noting that "[i]t is common . . . for agencies to set forth their statutory interpretations in the adjudicative process").  Specifically, OFAC has imposed such sanctions against entire networks of illicit actors, and then issued press releases and published Federal Register notices regarding those decisions.  *See Gen. Elec.*, 53 F.3d at 1329 (notice can come from "regulations and other public statements issued by the agency"); *see also, e.g.*, *Howmet*

*Corp.*, 614 F.3d at 554 (guidance manual provided sufficient notice of agency interpretation); *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1060 (D.C. Cir. 2007) (prior administrative and judicial decisions put company on fair notice); *PMD Produce Brokerage Corp. v. USDA*, 234 F.3d 48, 53 (D.C. Cir. 2000) ("Of course, the Secretary may utilize means other than the language of his Rules of Practice to give adequate notice of his interpretation."); *Perales v. Reno*, 48 F.3d 1305, 1316 (2d Cir. 1995) ("Due process cases have long recognized that publication in the Federal Register constitutes an adequate means of informing the public of agency action."), cited in *Howmet*, 614 F.3d at 554.  For instance, in 2005, OFAC simultaneously designated 24 individuals associated with a violent drug trafficking ring operating out of Mexico.  Treasury Designates Mexican Money Laundering Cell, https://www.treasury.gov/press-center/press-releases/Pages/js2191.aspx.  Likewise, in 2011, OFAC notified the public that it had simultaneously designated a Lebanese narcotics trafficker, "as well as nine individuals and 19 entities connected to his drug trafficking and money laundering organization."  Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, https://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.  And in 2016, OFAC published a notice in the Federal Register that it was designating an individual as a SDNT for playing a significant role in narcotics trafficking, while simultaneously designating five individuals for acting for or on behalf of that SDNT.  81 Fed. Reg. 68,500, 68,500-01 (Oct. 4, 2016).  These actions, as well as numerous other examples of simultaneous designations, are also described on OFAC's website, which lists each Kingpin Act designation imposed by OFAC. https://home.treasury.gov/system/files/126/narco_sanctions_kingpin.pdf.

Indeed, OFAC's practice of imposing simultaneous designations to combat international drug trafficking networks predates the Kingpin Act itself.  OFAC adopted a similar approach in

implementing EO 12978, which served as the model for the Kingpin Act, 21 U.S.C. § 1901(a).

*See* Treasury Names Front for the Colombian Drug Cartel, https://www.treasury.gov/press-center/press-releases/Pages/rr2475.aspx ("[O]ne of the leaders of Colombia's North Coast cartel, Julio Cesar Nasser David, and 14 businesses and 4 associated individuals that Treasury has determined are acting as fronts for the North Coast cartel's Julio Cesar Nasser David organization were added to the SDNT list."); 63 Fed. Reg. 28,898, 28,898-99 (May 27, 1998).

Plaintiff can thus hardly complain that he lacked fair notice of OFAC's consistent and longstanding interpretation that the Kingpin Act permits simultaneous designations.  Notably, he "makes no argument that [OFAC] previously interpreted those provisions differently, let alone that [he] relied on any such interpretation." *Suburban Air Freight*, 716 F.3d at 684.  Nor can Plaintiff claim that OFAC's interpretation is "so far from a reasonable person's understanding of the regulations that they could not have fairly informed [him] of the agency's perspective." *Id.* To the contrary, OFAC's interpretation is the most common-sense one, particularly given the goals of the Kingpin Act specifically and economic sanctions generally.  And Plaintiff may at any time utilize the administrative delisting process to attempt to demonstrate that his designation is no longer warranted. *See* 31 C.F.R. § 501.807; *Zevallos*, 793 at 117 (rejecting procedural due process claim, and emphasizing that the plaintiff "remains free now to continue contesting his designation by filing new delisting requests, meaning that he can make any new arguments that occur to him and reiterate and expand any arguments he felt received short shrift on Treasury's last review").

## C.    Any Error Was Harmless

Even if OFAC's designation decision contravenes any Fifth Amendment rights that Plaintiff may enjoy, Plaintiff cannot establish that any error was prejudicial.  To prevail on his

due process claim, Plaintiff must establish that the additional notice he seeks would have altered the outcome of OFAC's decision. *Zevallos*, 793 F.3d at 117 ("[I]f there was error, it was harmless. We have already held that the administrative record supports Treasury's conclusion that Zevallos should remain designated, and Zevallos does not suggest that reviewing his delisting request at a faster pace would have changed that outcome."). This he cannot do, given that substantial evidence supports OFAC's decision. *See* Part I.B, *supra*. Further, Plaintiff offers no reason to believe that a better understanding of OFAC's interpretation of the Kingpin Act would have led to a change in his relationship with El Aissami, such that he would no longer have been engaging in sanctionable conduct.

## III.   OFAC Was Not Required To Obtain A Warrant In Connection With Its Designation Of Plaintiff

Plaintiff claims that OFAC's designation decision violated his rights under the Fourth Amendment. Compl. ¶¶ 135-37, 141. Plaintiff may not invoke the Fourth Amendment, however, because he is a foreign national living outside the United States. And in any event, OFAC's decision did not effectuate a seizure, let alone an unlawful one.

### A.   Plaintiff Cannot Assert Fourth Amendment Rights

As with the Fifth Amendment, the Fourth Amendment offers no protection to foreign nationals living outside the United States. *Verdugo-Urquidez*, 494 U.S. at 264-75. And while a court is to evaluate a foreign national's ability to assert Fourth Amendment rights based on whether he has "come within the territory of the United States and developed substantial connections with this country[,]" *id.* at 271, it must do so with the additional consideration that "[t]he Fourth Amendment . . . protects a much narrower class of individuals than the Fifth Amendment." *United States v. Barona*, 56 F.3d 1087, 1093 (9th Cir. 1995). That is because the Fourth Amendment protects only those who are "among 'the People' of the United States,"

including foreign nationals who "are in this country voluntarily and presumably have accepted some societal obligations[.]" *Verdugo-Urquidez*, 494 U.S. at 272-73.

Plaintiff cannot demonstrate that he meets this exacting standard. First, Plaintiff's physical absence from the United States, Compl. ¶ 11, precludes his ability to assert a claim under the Fourth Amendment. As the Supreme Court explained, "it was never suggested that the [Fourth Amendment] was intended to restrain the actions of the Federal Government against aliens outside of the United States territory. . . . There is likewise no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters." *Verdugo-Urquidez*, 494 U.S. at 266-67; *see also United States v. Cabezas-Montano*, 949 F.3d 567, 593 (11th Cir. 2020) ("[T]he Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country." (emphasis omitted)); *Barona*, 56 F.3d at 1094 ("The term 'People of the United States' includes 'American citizens at home and abroad' and lawful resident aliens within the borders of the United States 'who are victims of actions taken in the United States by American officials.'" (quoting *United States v. Verdugo-Urquidez*, 856 F.2d 1214, 1234 (9th Cir. 1988) (Wallace, J., dissenting) (emphasis omitted)). Indeed, a finding that Plaintiff may "receiv[e] the privilege of invoking [the Fourth Amendment]," *Verdugo-Urquidez*, 856 F.2d at 1236 (Wallace, J., dissenting), is particularly inappropriate here. Rather than demonstrate allegiance to this country, *id.* at 1236-37, or membership in, or close connection to, the "political community[,]" *United States v. Esparza-Mendoza*, 265 F. Supp. 2d 1254, 1264-67 (D. Utah 2003), *aff'd*, 386 F.3d 953 (10th Cir. 2004), Plaintiff has threatened U.S. national security and foreign policy interests by furthering the narcotics trafficking activities of a corrupt and dangerous Venezuelan

31

politician, AR at 0006, 0025-27, 0658.

Dismissal of Plaintiff's Fourth Amendment claim would be warranted even if the Fourth Amendment could attach to a foreign national who lacks a territorial presence.  Plaintiff's lack of presence is not consistent with any continued, voluntary undertaking of societal obligations.  *Cf. Ibrahim*, 669 F.3d at 996-97.  To the contrary, his existing connections to the United States consist merely of financial interests.  Compl. ¶¶ 120-21.  These are insufficient to warrant the protections of the Fourth Amendment.  *See United States v. Baboolal*, No. 05-cr-215, 2006 WL 1674480, at *3 (E.D. Wis. June 16, 2006) (holding Fourth Amendment did not apply to search and seizure of property, where defendant had not been voluntarily present in the United States for three years and "[w]hen he has been physically within the United States, it has been for brief periods of time and for activities such as vacationing, shopping, or picking up family from the airport"; "[t]hese connections do not fit into the category of substantial, as might apply if one took up residence within this country"), *report and recommendation adopted*, No. 05-cr-215, 2006 WL 1942357 (E.D. Wis. July 11, 2006); *see also United States v. Alkhaldi*, No. 4:12-cr-00001-01, 2012 WL 5415787, at *4 (E.D. Ark. Sept. 17, 2012) (no substantial connections for purpose of asserting rights under the Second Amendment, where the defendant "did not come to the United States with the intention of gaining citizenship and . . . [t]here is nothing to suggest he intends to abandon his foreign resident [status]"), *report and recommendation adopted*, No. 4:12-cr-00001-01, 2012 WL 5415579 (E.D. Ark. Nov. 6, 2012); *cf. 32 Cty. Sovereignty Comm.*, 292 F.3d at 799; *Am. Immigration Lawyers Ass'n*, 18 F. Supp. 2d at 60 n.17.[9]

## B.    OFAC's Decision Did Not Effectuate A Seizure

Even if Plaintiff could assert rights under the Fourth Amendment, he is unable to

---

[9] Plaintiff cannot proceed simply by asserting his Fourth Amendment claim within the parameters of the APA, Compl. ¶¶ 139, 141.  *See Bazzi*, 468 F. Supp. 3d at 82.

establish that OFAC's "designation of [Plaintiff] under the Kingpin Act[,] its imposition of
blocking sanctions[,] and its blocking constitutes an unlawful seizure of [Plaintiff's] U.S.
properties[.]"  Compl. ¶ 137.  That theory cannot be reconciled with the purpose of the Fourth
Amendment, the historical context of sanctions actions, or the specific effect of blocking orders.

"What we know of the history of the drafting of the Fourth Amendment . . . suggests that
its purpose was to restrict searches and seizures which might be conducted by the United States
in *domestic* matters."  *Verdugo-Urquidez*, 494 U.S. at 266 (emphasis added); *see id.* ("The
driving force behind the adoption of the Amendment, as suggested by Madison's advocacy, was
widespread hostility among the former colonists to the issuance of writs of assistance
empowering revenue officers to search suspected places for smuggled goods, and general search
warrants permitting the search of private houses, often to uncover papers that might be used to
convict persons of libel.").  By contrast, and as reflected in the Kingpin Act and similar statutes
enacted over the past century, sanctions actions are designed to address international threats to
U.S. national security and foreign policy.  *See, e.g.*, 21 U.S.C. § 1902; 50 U.S.C. § 1701(a); *see
also Olenga*, 507 F. Supp. 3d at 265 (discussing enactment of the Trading with the Enemy Act in
1917).  Accordingly, the Fourth Amendment analysis cannot simply be mapped onto a challenge
to OFAC's designation decision.  *See also United States v. Brown*, 484 F.2d 418, 426 (5th Cir.
1973) ("Restrictions upon the President's power which are appropriate in cases of domestic
security become artificial in the context of the international sphere.").

The history of Executive and Legislative practice supports this conclusion.  "Since our
nation's infancy, many of its leaders have viewed economic sanctions as 'the most likely means
of obtaining our objects without war.'"  *Rakhimov*, 2020 WL 1911561, at *1 (quoting James
Madison, "Political Observations," National Archives (Apr. 20, 1795)).  Yet as far as Defendants

are aware, the Executive Branch has never obtained a warrant prior to imposing such sanctions.

And nothing in the Kingpin Act or other sanctions-related statutes suggests Congress believes

the Executive's exercise of such authorities implicates the Fourth Amendment generally or a

warrant requirement specifically.  *See, e.g.*, 21 U.S.C. § 1904; 50 U.S.C. § 1702.  Rather, in light

of Congress's broad delegation of authority, the President's power to block assets and take other

actions to nimbly respond to geopolitical crises should be considered "at its maximum[.]"  *Cf.*

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring);[10]

*Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) ("[A] systematic, unbroken, executive

practice, long pursued to the knowledge of the Congress and never before questioned . . . may be

treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II.").

      Nor does Plaintiff's theory comport with the actual effects of a blocking order.  In

general, a "'seizure' of property . . . occurs when 'there is some meaningful interference with an

individual's possessory interests in that property.'"  *Soldal v. Cook County, Ill*., 506 U.S. 56, 61

(1992) (citation omitted)).  When property is blocked by operation of sanctions imposed under

the Kingpin Act, however, the government does not take title to, possess, or move that property.

Instead, as OFAC has explained, "[t]itle to the blocked property remains with the [blocked

person], but the exercise of powers and privileges normally associated with ownership is

prohibited without authorization from OFAC.  Blocking immediately imposes an across-the-

board prohibition against transfers or dealings of any kind with regard to the property."

Frequently Asked Questions, https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9.

      Consistent with these considerations, courts in this district—including this Court—have

---

[10] The Supreme Court and lower courts have cited Justice Jackson's concurrence in sanctions-related cases.  *See, e.g.*, *Dames & Moore*, 453 U.S. at 660; *United States v. Amirnazmi*, 645 F.3d 564, 579 (3d Cir. 2011); *Glob. Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 796 (N.D. Ill. 2002), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

determined that the blocking of assets under sanctions programs does not constitute a seizure within the meaning of the Fourth Amendment. *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 48 (D.D.C. 2005) (Walton, J.) ("OFAC's blocking of the IARA-USA's assets does not create a cognizable claim under the Fourth Amendment."), *aff'd in part and remanded in part on other grounds*, 477 F.3d 728 (D.C. Cir. 2007); *Zarmach Oil Servs.*, 750 F. Supp. 2d at 160 (rejecting argument that the blocking of funds constituted a seizure within the meaning of the Fourth Amendment); *Holy Land Found.*, 219 F. Supp. 2d at 79 ("[T]he freezing of [] accounts is not a seizure entitled to Fourth Amendment protection.").[11]  Plaintiff cannot offer any reason that the Court should reverse course here.

## C.  Even if OFAC's Decision Constituted A Seizure, It Was Reasonable

The Fourth Amendment guarantees the right for individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  "[T]he Supreme Court has repeatedly instructed that the ultimate touchstone of the Fourth Amendment remains reasonableness."  *Kadi*, 42 F. Supp. 3d at 37 n.21 (citations omitted).  Here, even assuming OFAC's designation of Plaintiff effectuated a seizure of his U.S.-based assets, there can be no doubt that such a seizure was reasonable.  First, because OFAC's

---

[11] Defendants acknowledge that the Ninth Circuit found *Holy Land Foundation* and *Islamic American Relief Agency* unpersuasive. *Al Haramain v. U.S. Dep't of the Treasury*, 686 F.3d 965, 994 n.17 (9th Cir. 2012).  But the Ninth Circuit did not meaningfully analyze whether the blocking of the U.S. entity's assets constituted a Fourth Amendment seizure; the bulk of the decision was devoted to whether this presumed seizure was unreasonable under the Fourth Amendment. *See id.* at 990-95.  Further, in denying reconsideration, the Ninth Circuit emphasized not only the unique concerns related to OFAC's designating a U.S.-based organization as a SDN or terrorist, but also the narrowness of the *Al Haramain* decision to circumstances not present here. *Id*. at 970 & 995 n.18.

Similarly, in *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2006), the court held—erroneously, in the government's view—that OFAC's blocking actions effectuate a Fourth Amendment seizure.  But unlike the case here, which involves the direct designation of a foreign national living abroad, *Kindhearts* concerned a blocking pending investigation into whether a U.S.-based entity was a terrorist and a provisional designation determination. *See id.* at 874 ("KindHearts' situation differs strikingly and significantly from that of the foreign governments and foreign assets at issue in the TWEA and IEEPA cases on which the government relies.  KindHearts is an American corporation based in Toledo, Ohio.  Its assets, presumably, came from persons resident in this country.  Those assets were in this country when the government seized them.").

decision is "supported by substantial evidence, it follows that the blocking order was not issued unreasonably or without probable cause[,]" and Plaintiff's Fourth Amendment claim should be dismissed.  *Id.* at 37.

Second, blocking actions pursuant to the Kingpin Act are *per se* reasonable under the Fourth Amendment and so should not be subject to a probable cause standard or warrant requirement.  Certain actions, such as border searches, are by their very nature reasonable given that the interest of the government outweighs any personal privacy interest, and thus are not restricted by the Fourth Amendment.  *United States v. Flores-Montano*, 541 U.S. 149, 155 (2004) ("While the interference with a motorist's possessory interest is not insignificant when the Government removes, disassembles, and reassembles his gas tank, it nevertheless is justified by the Government's paramount interest in protecting the border."); *United States v. Ramsey*, 431 U.S. 606, 616 (1977) ("[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border[.]").  A Kingpin Act designation—which promotes the government's compelling interest in blocking property to address the national emergency posed by international narcotics trafficking, 21 U.S.C. §§ 1901(a)(4), 1905(a)(2)—fits readily in this category.  That is especially true given the special deference due to the Executive Branch in matters concerning national security and foreign policy, as well as the close coordination of the Legislative Branch and the attendant deference based on *Youngstown* principles.

Third, the blocking of Plaintiff's assets pursuant to the Kingpin Act falls within the special needs exception to the Fourth Amendment.  OFAC's action addresses a need "beyond the normal need for law enforcement[,]" *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619

(1989)—that is, the advancement of U.S. national security and foreign policy interests.  *See*

*Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the

denial of rehearing en banc) ("The Government's program for bulk collection of telephony

metadata serves a critically important special need—preventing terrorist attacks on the United

States. . . . [T]he Government's program fits comfortably within the Supreme Court precedents

applying the special needs doctrine."); *cf. Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006)

("Preventing or deterring large-scale terrorist attacks present problems that are distinct from

standard law enforcement needs and indeed go well beyond them.").  Further, requiring OFAC to

obtain a warrant prior to blocking assets would be "impracticable."  *Griffin v. Wisconsin*, 483

U.S. 868, 876 (1987).  In imposing sanctions, the Executive Branch must often act quickly to

prevent asset flight initiated by foreign actors who can transfer funds instantaneously.  *Zevallos*,

10 F. Supp. 3d at 127-29; *Holy Land Found.*, 219 F. Supp. 2d at 77.  Moreover, prior to issuing a

blocking order, the Executive Branch frequently does not know the identity, location, or holder

of the assets that will be blocked, as the order applies to all existing property and future

transactions and covers a variety of assets including bank accounts, real property, goods,

contracts, and other financial instruments.  *See* 31 C.F.R. § 598.312 (broadly defining property

and property interest); *cf.* 31 C.F.R. § 501.603 (requiring reports from holders of blocked

property).  Consequently, requiring a warrant prior to each blocking would impede the Executive

Branch's ability to choke off the money supply that facilitates the illicit activities of narcotics

traffickers and their supporters.  *See Kadi*, 42 F. Supp. 3d at 38.

Fourth, whether evaluated in the context of the special needs exception or a general

reasonableness test, weighing the interests at stake confirms that OFAC was not required to

obtain a warrant here.  *See Maryland v. King*, 569 U.S. 435, 448 (2013) ("This application of

traditional standards of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy." (cleaned up)); *Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack*, 681 F.3d 483, 489 (D.C. Cir. 2012) ("[W]here the government invokes special governmental needs, beyond the normal need for law enforcement, a court must balance the individual's privacy expectations against the government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." (cleaned up)).  Plaintiff asserts that OFAC's blocking action has affected his interest in "real properties, two vessels, aircraft, and four automobiles," Compl. ¶ 87, as well as certain financial accounts, *id.* ¶¶ 86-112.  Ownership interest alone, however, is insufficient.  *United States v. Salvucci*, 448 U.S. 83, 91 (1980).

Indeed, Plaintiff has not alleged the violation of any "subjective expectation of privacy" with respect to his identified assets.  *Kyllo v. United States*, 533 U.S. 27, 33 (2001).  Nor can Plaintiff establish that "society is willing to recognize . . . as reasonable" anything more than a diminished expectation of privacy as to these assets.  *Id.*; *see also Minnesota v. Carter*, 525 U.S. 83, 90 (1998) ("An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." (citation omitted)); *United States v. Miller*, 425 U.S. 435, 442 (1976) (no privacy interest in bank records); *United States v. Jenkins*, 984 F.3d 1038, 1041 (D.C. Cir. 2021) ("It is long established that 'there is a diminished expectation of privacy in automobiles[.]'" (citation omitted));[12] *Lindsey v. City of Sarasota*, No. 8:10-cv-1910, 2011 WL 13302500, at *2 (M.D. Fla. Feb. 2, 2011) (discussing "[f]ederal decisional precedent . . . permitting a suspicionless and warrantless search of a watercraft in a

---

[12] "This so-called automobile exception to the warrant requirement rests on two principal justifications: (1) the readiness with which vehicles can be moved out of the investigating jurisdiction and (2) the pervasive and continuing governmental regulation of vehicles." *Jenkins*, 984 F.3d at 1041 (cleaned up).  Vessels and aircraft also share these features.

variety of circumstances").

By contrast, it is difficult to conceive of a governmental interest more weighty than ensuring the effectiveness of sanctions programs that combat international narcotics trafficking and other foreign threats to the United States. *See, e.g.*, *Humanitarian Law Project*, 561 U.S. at 33-34 ("This litigation implicates the sensitive and weighty interests of national security and foreign affairs."); *Haig v. Agee*, 453 U.S 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation." (cleaned up)).

"The 'exacting process' under which the Government analyzes whether to issue a blocking order" further confirms the reasonableness of any supposed seizure. *See US VC Partners GP LLC v. U.S. Dep't of the Treasury, OFAC*, No. 19-cv-6139, 2020 WL 5578503, at *3 (S.D.N.Y. Sept. 17, 2020). Congress carefully set forth the criteria for designation under the Kingpin Act. 21 U.S.C. § 1904. Acting through delegated authority, OFAC must engage in interagency consultations and sufficiently demonstrate that each potential SDNT meets that criteria. *See id.* OFAC's process also contemplates that SDNTs may administratively request access to their blocked property or removal from the SDN List. 31 C.F.R. §§ 501.801, 501.807; *see also US VC Partners*, 2020 WL 5578503, at *3. By contrast, "it is not even clear that requiring a warrant in this case would even have much effect," given that Plaintiff is a foreign national living abroad "with substantial assets overseas." *Kadi*, 42 F. Supp. 3d at 37 n.21; Compl. ¶¶ 113-15. Thus "'the safeguard of a warrant would only minimally advance Fourth Amendment interests,' to the extent [Plaintiff] even has any Fourth Amendment protections." *Kadi*, 42 F. Supp. 3d at 37 n.21 (quoting *United States v. Jacobsen,* 466 U.S. 109, 125 (1984)).

## IV.   OFAC Provided Plaintiff Sufficient Notice Of The Reasons For Its Decision

In Count VI and VII of his Complaint, Plaintiff asserts that OFAC failed to adequately

disclose to him the reasons for the agency's decision, in violation of the Fifth Amendment and the APA.  Compl. ¶¶ 142-47.  Plaintiff's argument finds no support in fact or law.

A.     **OFAC's Disclosures Comply With Any Fifth Amendment Obligations**

The Court should dismiss Plaintiff's Fifth Amendment claim because, for the reasons stated in Part II.A, *supra*, Plaintiff lacks sufficient contacts with the United States to assert any Fifth Amendment rights.  Even assuming Plaintiff could assert such rights, the Court should nonetheless hold that OFAC's well-established administrative procedures satisfy due process.  In the context of OFAC's SDNT designations—where, to reiterate, pre-deprivation notice is not required, *Zevallos*, 793 F.3d at 116—due process mandates only that OFAC provide a plaintiff with "a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence in response[,]" *Zevallos*, 10 F. Supp. 3d at 131; *see also Fares v. Smith*, 249 F. Supp. 3d 115, 125-28 (D.D.C. 2017) (holding that "the total body of information provided by OFAC to Plaintiffs"—which included the redacted administrative record, press release, and non-privileged summaries of law enforcement sensitive information—"satisfie[d] due process"), *aff'd*, 901 F.3d 315 (D.C. Cir. 2018).

In light of the redacted administrative record, press release, press chart, Federal Register notice, and unclassified and non-privileged summaries of otherwise protected information, OFAC here has provided Plaintiff with sufficient notice of the agency's fact findings underlying its designation decision.  On the day it imposed sanctions against Plaintiff, OFAC issued a press release explaining that "El Aissami's primary frontman, Venezuelan national Samark Jose Lopez Bello" was "designated for providing material assistance, financial support, or goods or services in support of the international narcotics trafficking activities of, and acting for or on behalf of, El Aissami."  AR at 0006; *see also* 82 Fed. Reg. at 11,101-02 (reiterating this determination in a

Federal Register notice published four days after designation).  The press release and redacted administrative record further apprise Plaintiff of the specific findings that support OFAC's conclusion.  For instance, OFAC explained that "Lopez Bello is a key frontman for El Aissami and in that capacity launders drug proceeds."  AR at 0006; *see id.* at 0025 (concluding that Plaintiff is "acting as a financial manager and front man for [El Aissami]"); *see also id.* at 0208, 0452, 0602-04.  OFAC also noted that "Lopez Bello is used by El Aissami to purchase certain assets" and "also handles business arrangements and financial matters for El Aissami, generating significant profits as a result of illegal activity benefiting El Aissami."  *Id.* at 0006.

While this information provides a clear path for Plaintiff to challenge his designation through the process afforded to him under OFAC's regulations, OFAC additionally produced to Plaintiff unclassified and non-privileged summaries of otherwise protected information on July 18, 2017.  *Id.* at 0657-58.  These summaries further describe to the extent possible, consistent with the national security interests of the United States, the specific evidence OFAC relied on in determining that Plaintiff meets the criteria for designation under 21 U.S.C. § 1904(b)(2)-(3):

- "Venezuelan national Samark Jose Lopez Bello is the 'frontman' for Tareck El Aissami."

- "Lopez Bello is in charge of laundering drug proceeds through Petróleos de Venezuela, S.A. (PDVSA) and organizing the air and maritime cocaine routes to transport cocaine to the Middle East and Asia.  Lopez Bello was used by El Aissami to purchase news outlets in Venezuela, which were the most critical of the Chavez regime, with Venezuelan government funds in order to influence public opinion in Venezuela."

- "Lopez Bello is identified as the 'business representative,' 'money manager,' and 'money launderer' for El Aissami."

- "Lopez Bello handles financial matters for El Aissami.  Lopez Bello also manages Venezuelan bonds, as a private party, and conducts unspecific deals which generate significant profits.  This activity is done to benefit El Aissami via Lopez Bello.  Lopez Bello also has procured vehicles in the U.S. that were transported to Venezuela and ultimately went to El Aissami and other Venezuelan government officials."

*Id.* at 0658.

The provision of this information to Plaintiff more than satisfies due process, as he "ha[s] been apprised . . . of the government's view regarding the basis for [his] designation[], and as such, can meaningfully 'proffer rebuttal evidence and arguments to OFAC to contest [his] designation[].'" *Fares*, 249 F. Supp. 3d at 127 (citation omitted). The Fifth Amendment requires nothing more. *See Jifry*, 370 F.3d at 1183-84 (holding that the government satisfied notice requirements of due process by informing pilots, all foreign nationals, that their airmen certificates had been revoked based on TSA's determination that they were a "security threat[,]" without requiring agency to disclose the reasons for the determination, which were classified).

Plaintiff cannot establish otherwise. He primarily complains that OFAC "ha[s] redacted substantial portions of the evidentiary memorandum[.]" Compl. ¶ 144. But the record related to Plaintiff's designation is redacted only insofar as it contains classified and law enforcement privileged information, and OFAC has no obligation to produce that information to any plaintiff, let alone one who is a demonstrated supporter of an international narcotics trafficker and is under indictment in the United States. *Fares*, 901 F.3d at 324-25; *see also, e.g.*, *Sulemane*, 2019 WL 77428, at *7 ("[E]specially given OFAC's determination that he remained a significant foreign narcotics trafficker, it is quite obvious why it did not provide him this information, which could reveal the government's sources and methods.").

The Court should also reject Plaintiff's request for "sufficiently specific unclassified summaries of the classified or privileged portions of the evidentiary memorandum relating to the basis for [Plaintiff's] designation[.]" Compl., Relief Requested ¶ H. This request is factually flawed, as OFAC has already provided such summaries. AR at 0657-58. The request is legally deficient as well. "While courts have recognized that unclassified summaries of classified information on which an agency relied may be helpful to litigants, they are not required and

'disclosure may not always be possible.'" *FBME Bank Ltd.*, 125 F. Supp. 3d at 119 n.2 (citation

omitted).  In fact, no court within this Circuit has ordered OFAC to produce to a SDN an

unclassified and non-privileged summary of otherwise protected information, and Plaintiff

provides no basis for this Court to break new ground.  *See Rakhimov*, 2020 WL 1911561, at *7

(declining to consider the plaintiff's request that the court "impose the unprecedented remedy of

mandating the issuance of an unclassified summary[,]" and "instead allow[ing] the

reconsideration process to unfold").

Additionally, any error associated with the notice provided by OFAC would be harmless.

As explained in Part II.C, *supra*, Plaintiff is unable to demonstrate that such error "would have

affected the outcome" of OFAC's decision-making process, *Zevallos*, 10 F. Supp. 3d at 132; *see

also Zevallos*, 793 F.3d at 117, as OFAC's conclusion is based on substantial evidence that

Plaintiff meets the criteria for designation under the Kingpin Act.  Thus, even if the Court were

to reach the merits of Count VI, it should grant Defendants' motion.

## B.   OFAC's Disclosures Comply With Any APA Obligations

Relying on 5 U.S.C. § 706(2)(A) and (2)(D), Plaintiff asserts in Count VII of his

Complaint that OFAC's decision is "not in accordance with law and without observance of

procedure required by law because Defendants failed to provide [him] with adequate notice of

the reasons for his designation."  Compl. ¶ 147.  But because Plaintiff's contacts with the United

States are insufficient to grant him constitutional protections, "the APA does not provide him

separate constitutional-equivalent protection."  *Bazzi*, 468 F. Supp. 3d at 82.  In other words,

Plaintiff "is not entitled to fair notice of the basis for his [SDNT] designation under either the

Constitution or the APA."  *Id.*  And in any event, as explained above in response to Plaintiff's

due process claim, whatever level of notice might be required by the APA was satisfied here in

light of OFAC's press release, press chart, Federal Register notice announcing Plaintiff's designation, redacted administrative record, and unclassified and non-privileged summaries of otherwise protected information.  *See* Part IV.A, *supra*.

Plaintiff's argument also fails insofar as he is complaining about the contents of the administrative record.  The APA requires OFAC to provide Plaintiff with the administrative record related to its decision once a lawsuit is initiated.  *Cf. Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("the focal point for judicial review should be the administrative record"). In accordance with that requirement, OFAC has provided Plaintiff the unclassified and non-privileged documents considered in the decision to designate him as a SDNT.  ECF No. 5; *see also* AR at 0009.  And the unclassified and non-privileged summaries of otherwise protected information that OFAC provided him—though it was not required to do so, *FBME Bank Ltd.*, 125 F. Supp. 3d at 119 n.2—represent the extent of additional information releasable at this time. *See* AR at 0657-58.  Plaintiff cannot establish that he is entitled to anything further, including the classified or otherwise protected portions of the record.  *See, e.g.*, *Olenga*, 507 F. Supp. 3d at 278; *Rakhimov*, 2020 WL 1911561, at *7; *Sulemane*, 2019 WL 77428, at *7.

Nor can Plaintiff advance his theory by relying on § 706(2)(D) of the APA, Compl. ¶ 145, which provides that a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Plaintiff does not even identify the procedure that OFAC allegedly failed to follow. *See* Compl. ¶¶ 145-47.  For this reason alone, Plaintiff's claim should be dismissed.  *See Iqbal*, 556 U.S. at 678 (conclusory allegations do not satisfy basic pleading standards).  And insofar as Plaintiff's claim under § 706(2)(D) is duplicative of his claim under § 706(2)(A), the Court should reject it for the reasons stated above.  *See also Safari Club Int'l v. Zinke*, 878 F.3d 316,

325 (D.C. Cir. 2017) ("[E]ven in cases arising under § 706(2)(D), the arbitrary-and-capricious standard frequently governs." (citation omitted)).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or, in the alternative, for summary judgment, and enter judgment in favor of Defendants on all claims.

Dated September 13, 2021                          Respectfully submitted,

                                                  BRIAN M. BOYNTON
                                                  Acting Assistant Attorney General

                                                  DIANE KELLEHER
                                                  Assistant Branch Director

                                                  */s/Stuart J. Robinson*
                                                  STUART J. ROBINSON
                                                  Senior Counsel
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  450 Golden Gate Ave.
                                                  San Francisco, CA 94102
                                                  Tel: (415) 436-6635
                                                  Fax: (415) 436-6632
                                                  Email: stuart.j.robinson@usdoj.gov
                                                  Cal. Bar No. 267183

                                                  *Counsel for Defendants*