### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMARK JOSE LÓPEZ BELLO, ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> BRADLEY T. SMITH, in his official capacity as Acting Director, Office of Foreign Assets Control, <u>et al.</u>, ) <br><br> Defendants. ) | Civil Action No. 21-1727 (RBW) |

### <u>MEMORANDUM OPINION</u>

The plaintiff, Samark Jose López Bello, brings this civil action against the defendants,

Bradley T. Smith in his official capacity as Acting Director, Office of Foreign Assets Control,

and the United States Department of the Treasury, Office of Foreign Assets Control, challenging

his designation under the Foreign Narcotics Kingpin Designation Act (the "Kingpin Act") as a

specially designated narcotics trafficker, pursuant to the Administrative Procedure Act (the

"APA"), 5 U.S.C. §§ 551–59, <u>see</u> Amended Complaint ("Am. Compl.") ¶¶ 126–31, 138–41,

145–47, ECF No. 8, the Fourth Amendment of the United States Constitution, <u>see</u> <u>id.</u> ¶¶ 135–37,

and the Fifth Amendment of the United States Constitution, <u>see</u> <u>id.</u> ¶¶ 132–34, 142–44.

Currently pending before the Court is (1) the Defendants' Motion to Dismiss or, in the

Alternative, for Summary Judgment ("Defs.' Mot." or the "defendants' motion"), ECF No. 10,

and (2) the Plaintiff's Cross Motion for Summary Judgment and Opposition to Defendants'

Motion to Dismiss or, in the Alternative, for Summary Judgment ("Pl.'s Mot." or the "plaintiff's

motion"), ECF No. 12.  Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must grant in part and deny in part the defendants' motion and deny as moot the plaintiff's cross-motion.  The defendants' motion is granted to the extent that it seeks dismissal pursuant to Rule 12(b)(6) and denied in all other respects.

## I.    BACKGROUND

### A.    Statutory Background

In 1999, Congress enacted the Kingpin Act, Pub. L. 106-120, tit. VIII, § 801, 113 Stat. 1626 (codified at 21 U.S.C. §§ 1901–08).  The purpose of the Kingpin Act is to:

> provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States.

21 U.S.C. § 1902.  The Kingpin Act authorizes the President to designate "foreign person[s] that play[] a significant role in international narcotics trafficking" as "significant foreign narcotics traffickers."  Id. §§ 1903(b), 1907(7).  It also authorizes the Secretary of the Treasury, in consultation with other Executive Branch officials, to designate as "specially designated narcotics traffickers" foreign persons they believe to be "materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of," or "owned, controlled, or directed by, or acting for or on behalf of" a significant foreign narcotics trafficker designated under 21 U.S.C. Section 1903(b).  31 C.F.R. § 598.314(b)(1)–(2); 21 U.S.C.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mem."), ECF No. 10-1; (2) the Memorandum of Points and Authorities in Support of Plaintiff's Cross Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Pl.'s Mem."), ECF No. 12-1; (3) the Defendants' Consolidated Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Opp'n"), ECF No. 13; and (4) the Plaintiff's Reply Memorandum in Support of [its] Cross-Motion for Summary Judgment ("Pl.'s Reply"), ECF No. 15.

§§ 1904(b)(2)–(3).  The Secretary of the Treasury may also designate as "specially designated narcotics traffickers" foreign persons whom he or she believes "play a significant role" in international narcotics trafficking.  31 C.F.R. § 598.314(b)(3) (2021); 21 U.S.C. § 1904(b)(4).  A "specially designated narcotics trafficker" designation by the Secretary of the Treasury or the Office of Foreign Assets Control (the "OFAC") pursuant to Section 1904(b) is a different designation than that made by the President under § 1903(b).  See 31 C.F.R. § 598.314 (2021).  The Secretary of the Treasury may delegate this authority to designate foreign persons as "specially designated narcotics traffickers" to the OFAC.  See 31 C.F.R. § 598.803.

The names of specially designated narcotics traffickers are published by the OFAC in the Federal Register and on the OFAC's Specially Designated Nationals and Blocked Persons List.  See 31 C.F.R. § 598.314 n.1.  Moreover, as a consequence of being designated, the OFAC may block a foreign designated person's property or interests in property.  See 21 U.S.C. § 1904(b).  Designated persons may "seek administrative reconsideration of [their] designation . . . or assert that the circumstances resulting in [their designation] no longer apply" and thus request that the OFAC "rescind[] [the designation] pursuant to . . . administrative procedures."  See 31 C.F.R. § 501.807 (2021).

**B.    Factual Background**

The plaintiff, Samark Jose López Bello, "is and was at all times relevant [to this litigation] a citizen of Venezuela and Italy."  Am. Compl. ¶ 11.  On February 13, 2017, the OFAC designated the plaintiff as a "specially designated narcotics trafficker" under the Kingpin Act for providing "material assistance, financial support, or goods and services in support of" the international narcotics trafficking activities of another specially designated narcotics trafficker, Tareck Zaidan El Aissami.  Id. ¶ 2.  "[A]t the time of the designation," El Aissami was "the Vice

President of the Government of Venezuela." Id.  The OFAC designated El Aissami "simultaneous with, and as part of the same designation action targeting, [the plaintiff]." Id. ¶ 4; see id. ¶ 21 (stating that El Aissami was designated on February 13, 2017).  At the time of his designation, the plaintiff held two United States ("U.S.") visas—an L1 ('temporary worker') visa and a B1/B2 ('business or tourism visitor') visa—" and "resided . . . [in] Coral Gables, F[lorida]." Id. ¶ 120.  "[The plaintiff] was physically present in the United States pursuant to these U.S. visas approximately a week before his designation[.]" Id.  At that time, the plaintiff's "wife was also [a U.S.] resident under a 'temporary worker' visa." Id. ¶ 121.  They have four children, "[t]wo of [whom] are U.S. citizens[,] . . . [and] three of [them] were studying in the United States" prior to the plaintiff's designation. Id.  "Simultaneous with [the plaintiff]'s designation," the OFAC blocked various property owned by the plaintiff, including "U.S. companies alleged to be owned or controlled by [the plaintiff], a U.S.-registered aircraft in which [the plaintiff] allegedly retained an interest, and several U.S.-based real properties and other U.S. assets—including vessels and automobiles—in which [the plaintiff] exercised ownership or control." Id. ¶ 23; see id. ¶¶ 23–26, 86.

On March 8, 2019, the United States Attorney's Office for the Southern District of New York charged the plaintiff with violations of the Kingpin Act. See id. ¶ 82.  According to the superseding indictment, issued in March 2020, "[the plaintiff] worked with U.S. citizens and visa-holders to obtain travel services, including private jet charters[,]" in violation of "the Kingpin Act's prohibition on U.S. persons engaging in transactions with or providing services to [the plaintiff]." Id. ¶ 83.

On March 9, 2017, pursuant to the Kingpin Act, "[the plaintiff] requested the full administrative record underlying his designation and the blocking of his properties." Id. ¶ 27.

On April 12, 2017, the OFAC responded by providing the plaintiff with the portions of the administrative record regarding the blocking of one of his South Florida properties and indicating that the remaining information regarding his designation "remained in processing and would be provided to him as soon as it was cleared for release." Id. ¶ 28. On May 22, 2017, the OFAC sent to the plaintiff additional portions of "the administrative record related to [his] designation and that of his companies, including certain U.S.-based companies; his U.S.-registered aircraft; and other real estate and assets in the United States." Id. ¶ 32. The portions of the administrative record that was sent on May 22, 2017, included an evidentiary memorandum containing information that, according to the OFAC, "provide[d] reason to believe that [the plaintiff] is a foreign person who is materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of . . . El Aissami[.]" Id. ¶ 33. "This conclusion, according to [the] OFAC, provide[d] the grounds to determine that [the plaintiff] 'meets the criteria for designation as a[] [specially designated narcotics trafficker.]'" Id. Much of the record was redacted, see, e.g., id. ¶ 36, and the only "unredacted paragraph state[d] that, '[a]ccording to a July 2013 article in the Venezuelan online newspaper, Reportero 24, [López Bello] is "linked as [a] front m[a]n" for EL AISSAMI. The article asserts that [López Bello] has an estimated net worth of $1 billion.'" Id. ¶ 37 (all but the first alteration in original).

On July 18, 2017, the OFAC provided the plaintiff with "additional unclassified, non-privileged, or otherwise releasable information from the administrative record." Id. ¶ 74. The summaries explain the bases for the plaintiff's designation. See, e.g., id. ¶¶ 75–80 (providing information that the plaintiff "is the 'frontman' for [ ] El Aissami," that he is "in charge of laundering drug proceeds . . . and organizing the air and maritime cocaine routes to transport

cocaine[,]" that El Aissami used the plaintiff to purchase certain assets like news outlets, and that the plaintiff is El Aissami's front man, "money manager" and "money launderer" (internal quotation marks omitted)).  On November 3, 2021, the OFAC provided the plaintiff with nine additional pages from the administrative record that were approved for release.  See Defs.' Mem. at 8.

## C.   Procedural History

The plaintiff filed his Complaint on June 29, 2021, see Complaint ("Compl.") at 1, ECF No. 1, and filed his Amended Complaint on October 4, 2021, see Am. Compl. at 1.  The defendants filed their motion to dismiss, or in the alternative, for summary judgment, on November 3, 2021.  See Defs.' Mot. at 1.  The plaintiff filed his opposition and cross-motion on December 3, 2021.  See Pl.'s Mot. at 1.  On January 7, 2022, the defendants filed their consolidated opposition to the plaintiff's motion and reply in support of their own motion.  See Defs.' Opp'n at 1.  Finally, the plaintiff filed his reply in support of his motion on February 6, 2022.  See Pl.'s Reply at 1.

## II.      STANDARD OF REVIEW

## A.   Motion to Dismiss Pursuant to Rule 12(b)(6)

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice" when ruling on a Rule 12(b)(6) motion. Equal Emp. Opportunity Comn'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## B.   Federal Rule of Civil Procedure 12(d)

Federal Rule of Civil Procedure 12(d) provides that

> if, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). "The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to the sound discretion of the trial court." Flynn v. Tiede-Zoeller, Inc., 412 F. Supp. 2d 46, 50 (D.D.C. 2006). Furthermore, "[w]hen the defendant expressly moves for summary judgment in the alternative to a motion to dismiss before discovery has been conducted, and relies upon extra-pleading material, to which the plaintiff has an opportunity to

respond, the Court need not issue separate prior notice of the conversion." Proctor v. District of

Columbia, 74 F. Supp. 3d 436, 448 (D.D.C. 2014).  However, in the context of a motion to

dismiss, or in the alternative, for summary judgment, the Court may decline to convert the

motion to one for summary judgment, even where a party has included extra-pleading material,

so long as "the record reflects that it considered only the items listed in Rule 12(b)(6)." Ruffin v.

Gray, 443 F. App'x 562, 563 (D.C. Cir. 2011) (noting that the district court need not have

"expressly exclude[d] the [extra-pleading] attachments[,]" so long as it specifies that it did not

consider them (emphasis in original)).  "If extra-pleading evidence is comprehensive and will

enable a rational determination of a summary judgment motion, a district court will be more

likely to convert the motion to one for summary judgment, but when it is scanty, incomplete, or

inconclusive, the district court is more likely to decline to convert to summary judgment[.]"

Proctor, 74 F. Supp. 2d at 448 (internal quotation marks omitted).[2]

### III.    ANALYSIS

The defendants contend that: (1) the plaintiff's arguments regarding his claim under the

APA "do nothing to undermine the reasonableness of the agency's decision, which is fully

supported by the administrative record[,]" Defs.' Mem. at 2; (2) regarding the plaintiff's Fifth

---

[2] The Court will not convert the defendants' motion to dismiss to one for summary judgment.  See Defs.' Mem. at 3 (requesting that the Court "dismiss [the p]laintiff's claims or, in the alternative, grant summary judgment in favor of [the d]efendants"); id. at 11 (summarizing the effect of Rule 12(d)).  The only extra-pleading material submitted by either party is an affidavit attached to the defendants' reply.  See Defs.' Opp'n, Exhibit ("Ex.") A (Declaration of Ripley Quinby ("Quinby Decl.")), ECF No. 13-1.  The Court declines to do so because the extra-pleading material is "scanty[,]" Proctor, 74 F. Supp. 3d at 448, and the Court can adequately address this matter by resolving the defendants' motion to dismiss, and therefore finds it inappropriate to convert the motion to one for summary judgment, see Flynn, 412 F. Supp. 2d at 51 (declining to convert a motion to dismiss where "such treatment would be premature" because "conversion . . . would do little to resolve the issues presented").  Accordingly, in reaching its decision regarding the defendants' motion to dismiss, the Court has only considered factual allegations to the extent that they are contained "in the complaint, documents attached to or incorporated by reference in the complaint, and matters subject to judicial notice." Ruffin, 443 F. App'x at 563 (affirming the district courts decision not to convert a motion to dismiss because "[a]lthough the court did not expressly exclude the attachments to both [parties' briefs], the record reflects that it considered only the items listed in Rule 12(b)(6)").  Furthermore, in light of the Court's decision not to convert the defendants' motion to dismiss, the Court will deny as moot the plaintiff's cross-motion for summary judgment.

Amendment claim, "[a]s a foreign national without substantial contacts with the United States, [ ] [the p]laintiff cannot assert any constitutional due process rights[, a]nd even if he were able to do so, OFAC's decision in no way deprived [him] of any such rights[,]" id.; (3) regarding the plaintiff's Fourth Amendment claim, he "incorrectly alleges that the blocking order issued by OFAC effectuated an unlawful seizure[,]" id.; and (4) "whether viewed through the lens of the Constitution or the APA, the information disclosed to [the p]laintiff . . . more than adequately apprised [the p]laintiff of the basis for OFAC's action[,]" id. at 3. In response, the plaintiff argues that: (1) "[the d]efendants' [d]esignation of [the p]laintiff [c]onstitutes [a]rbitrary and [c]apricious [a]gency [a]ction in [v]iolation of the APA[,]" Pl.'s Mem. at 11; (2) "[the d]efendants [v]iolated the APA by [e]xceeding the [s]cope of [i]ts [a]uthority [u]nder the Kingpin Act [w]hen [d]esignating [the p]laintiff [as a specially designated narcotics trafficker,]" id. at 17; (3) "[the d]efendants [v]iolated [the p]laintiff's Fifth Amendment [d]ue [p]rocess [r]ight[,]" id. at 24; and (4) "OFAC's [b]locking [a]ction [c]onstitutes an [u]nreasonable [s]eizure of [the p]laintiff's [p]roperty [i]n [v]iolation of the Fourth Amendment[,]" id. at 40.

The Court will first address the arguments advanced by the parties regarding the plaintiff's APA claims. Next, the Court will address the plaintiff's Constitutional claims brought pursuant to the Fourth and Fifth Amendments, including the threshold issue regarding whether the plaintiff can assert rights under the United States Constitution.

## A.    The Plaintiff's APA Claims

### 1.   Whether OFAC's Designation of the Plaintiff as a Specially Designated Narcotics Trafficker Was Arbitrary and Capricious under the APA

In reaching its decision to designate the plaintiff as a specially designated narcotics trafficker, the OFAC relied on sensitive information that could not be made available to the plaintiff. However, the defendants argue that the "unclassified and non-privileged portions of

the administrative record alone provide[d] a rational basis" for designating the plaintiff.  Defs.'
Mem. at 3, 13.  In his motion, the plaintiff raises two arguments regarding his APA claims.  First,
he argues that the defendants' reliance on a Venezuelan news article "without any effort to
corroborate" the information therein constitutes arbitrary and capricious agency action.  Pl.'s
Mem. at 13–14.  Second, the plaintiff argues that the evidence in the administrative record that
the OFAC used "cannot support a legal determination that [the p]laintiff met criteria for
designation."  Id. at 13.  Addressing these arguments in turn, the Court concludes for the
following reasons that the agency's reliance on the evidence and facts made available to it was
not unlawful agency action and its ultimate decision based on that evidence was not arbitrary and
capricious.

When a court reviews agency action, the action must be overturned if it was "'arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance with law,' or if it failed to meet
statutory, procedural, or constitutional requirements."  Citizens to Preserve Overton Park, Inc. v.
Volpe, 401 U.S. 402, 414 (1971) (quoting 5 U.S.C. § 706(2)).  Under the "arbitrary and
capricious" standard of review, the court's scope of review is "narrow and a court is not to
substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut.
Auto. Ins. Co., 463 U.S. 29, 43 (1983).  In rendering its decision, an agency must "examine the
relevant data and articulate a satisfactory explanation for its action including a 'rational
connection between the facts found and the choice made.'"  Id.; see also Fulmen Co. v. Off. of
Foreign Assets Control, 547 F. Supp. 3d 13, 23 (D.D.C. 2020).  As to the OFAC's decisions to
designate foreign nationals as specially designated narcotics trafficker, its decisions are evaluated
pursuant to the APA's highly deferential standard of review, see Islamic Am. Relief Agency v.
Gonzales, 477 F.3d 728, 732 (D.C. Cir. 2007), and from this perspective a plaintiff must show

that "the rationale behind his original designation was never true or is no longer true[,]" Joumaa
v. Mnuchin, 798 F. App'x 667, 668 (D.C. Cir. 2020) (internal quotation marks omitted).  On the
other hand, the OFAC "is not required to provide concrete evidence" supporting its decision in
order to defeat a plaintiff's APA claims, but "can instead base its decision on informed
judgment."  Hejeij v. Gacki, No. 19-cv-1921 (TFH), 2020 WL 5545555, at *5 (D.D.C. Sept. 16,
2020).

     An already deferential review is made even more deferential to the agency's decisions in
matters, as here, concerning matters of foreign policy and national security.  See Islamic Am.
Relief Agency, 477 F.3d at 734 ("[O]ur review—in an area at the intersection of national
security, foreign policy, and administrative law—is extremely deferential."); Zevallos v. Obama,
10 F. Supp. 3d 111, 119 (D.D.C. 2014) ("[T]he D.C. Circuit has suggested that an even more
deferential review applies when matters of foreign policy and national security are concerned").
Furthermore, courts "owe a substantial measure of deference to the political branches in matters
of foreign policy, including cases involving blocking orders[.]"  Zarmach Oil Servs., Inc. v.
United States Dep't of the Treasury, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (internal quotation
marks omitted).

     As already noted, the plaintiff first argues that the defendants' "reliance on news
reporting from Venezuelan online publications" constituted "arbitrary and capricious agency
action" because there was no "effort to corroborate the allegations" contained in them.  Pl.'s
Mem. at 13–14; see also Am. Compl. ¶ 37.  However, this Court and the D.C. Circuit have made
clear that in designation cases such as this one, evidence is evaluated by considering "the
evidence in the record as a whole[,]" rather than singling out one piece of evidence and
considering its individual sufficiency.  See infra Section III.B.2.c; Kadi v. Geithner, 42 F. Supp.

3d. 1, 17, 23 (D.D.C. 2012) (noting that the Court makes its findings by viewing all the evidence as a whole).  It is enough that the evidence when "viewed as a whole" provides a sufficient basis to understand the OFAC's decision.  Zevallos, 10 F. Supp. 3d at 120 (finding that newspaper articles combined with other forms of evidence provided sufficient evidence for the OFAC to arrive at the conclusion that the plaintiff played "a significant role in international narcotics trafficking" and warranted designation).  Here, the OFAC, when deciding to designate the plaintiff, did not rely solely on the Venezuelan newspaper article as evidence that the plaintiff should be designated, but rather used it in combination with other evidence compiled during the OFAC's "multi-year investigation[,]" Defs.' Mem. at 6, 14–15 (describing the evidence considered in the agency's ultimate decision to designate the plaintiff).  Therefore, according the heightened deference required for agency decisions in matters of foreign policy, see Zarmach Oil Servs., Inc., 750 F. Supp. 2d at 155, the Court concludes that consideration of the media reports, regardless of their independent level of credibility and considered in combination with the other evidence relied on by the OFAC, belies the plaintiff's claim that the agency's decision to designate him as a specially designated narcotics trafficker was arbitrary and capricious under the APA, see id. at 154 ("When a district court reviews agency action under the APA, as is the case here, the court may reverse the agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (internal quotation marks omitted)).

Second, the plaintiff argues that the evidence provided to him by the OFAC "lack[s] an apparent nexus" to El Aissami and his trafficking activities.  Pl.'s Mem. at 14.  In response, that defendants argue that §§ 1904(b)(2) and 1904(b)(3) of the Kingpin Act do not require the OFAC "establish some nexus" between the plaintiff's activities and El Aissami's trafficking of narcotics "in order to designate the plaintiff as a [specially designated narcotics trafficker.]"  Defs.' Mem.

at 16–17.  Indeed, the Kingpin Act only requires that a person be found to be "materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of[;]" "owned, controlled, or directed by, or acting for or on behalf of[;]" or "playing a significant role in" the international narcotics trafficking activities of an international narcotics trafficker.  21 U.S.C. §§ 1904(b)(2)–(4); 31 C.F.R. § 598.314; see Defs.' Mem. at 16–17.  There is no specific amount of "material assistance" or "support" a person must have provided to a major foreign narcotics trafficker in order to trigger the sanctions provided in the Kingpin Act, nor is there a specific quantum of evidence required.  21 U.S.C. §§ 1904(b)(2)–(4).  Therefore, all that is required for the OFAC's designation decision not to be considered arbitrary and capricious under the APA is a determination that the OFAC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made[,]" Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006) (internal quotation marks omitted); see Joumaa, 798 F. App'x at 668 ("While [the] OFAC did not link every instance of money laundering to the drug trade, nothing in the Kingpin Act requires it to do so.").

Thus, the plaintiff was reasonably designated based on his "close involvement" with El Aissami because the OFAC established a "rational connection between the facts found[,]" Alpharma, Inc., 460 F.3d at 6, and that conclusion.  See Kadi, 42 F. Supp. 3d at 18 (confirming the OFAC's finding that the plaintiff was supporting already-designated terrorists and that, based on its review of both classified and unclassified records, there was sufficient factual information to connect the plaintiff to a terrorist organization).  The content of the unclassified summaries provided by the OFAC, see Am. Compl. ¶¶ 74–81, supports its conclusion that the plaintiff provided material assistance to El Aissami, a designated narcotics trafficker.  See Defs.' Mem. at

16 (arguing that the OFAC's "unclassified and non-privileged summaries" were sufficient to establish a basis for its designation of the plaintiff because they were "distilled from protected information, and additional disclosure was not possible given the national security and law enforcement interests at stake[,]" and "[c]ourts have upheld designations based on similar findings by [the] OFAC"); Kadi, 42 F. Supp. 3d at 18 (finding that the plaintiff had "close involvement in the financing of terrorist activities and support of" designated global terrorists and  where "[e]vidence in the unclassified record indicates that [the plaintiff] was integrally involved in running [the terrorist organization] . . . [and] in providing financial support for terrorists").  For example, the evidence examined by the OFAC indicated that the plaintiff "is the frontman for [ ] El Aissami[,]" Am. Compl. ¶ 76 (internal quotation marks omitted); "is in charge of laundering drug proceeds . . . and organizing the air and maritime cocaine routes to transport cocaine to the Middle East and Asia[,]" id. ¶ 77 (internal quotation marks omitted); "was used by El Aissami to purchase news outlets in Venezuela . . . in order to influence public opinion in Venezuela[,]" id. ¶ 78 (internal quotation marks omitted); "is identified as the 'business representative,' 'money manager,' and 'money launderer' for El Aissami[,]" id. ¶ 79 (internal quotation marks omitted); and "handles financial matters for El Aissami[,]" id. ¶ 80 (internal quotation marks omitted).  The OFAC has authority to make lawful decisions to designate a foreign national when the evidence is sufficient to show that the foreign national is in some way assisting or supporting another designated foreign national.  See Kadi, 42 F. Supp. 3d at 18.  And accordingly, the Court concludes that, viewing the evidence of the plaintiff's relationship to El Aissami as his "frontman[,]" Am. Compl. ¶ 76, and "money manager[,]" id. ¶ 79, coupled with the plaintiff's association with El Aissami as a whole, see id. ¶¶ 75–80 (describing the OFAC's summaries of the plaintiff's involvement with and assistance of El

Aissami), establishes that the OFAC has "examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice" to designate the plaintiff as a specially designated narcotics trafficker, Alpharma, Inc., 460 F.3d at 6, namely, that the plaintiff was materially assisting or providing support to El Aissami in drug trafficking activities, see, e.g., Am. Compl. ¶¶ 75–80. See 21 U.S.C. § 1904(b)(2)–(3); 31 C.F.R. § 598.314. Therefore, the Court concludes that the OFAC's determination of the plaintiff's involvement in trafficking activities based on the entirety of the evidence before it was not arbitrary and capricious. See Zarmach Oil Servs., Inc., 750 F. Supp. 2d at 154.

**2. Whether the Defendants' Simultaneous Designation of El Aissami and the Plaintiff Under the Kingpin Act Constituted Arbitrary and Capricious Agency Action**

The plaintiff next contends that the "simultaneous designation of El Aissami and [the p]laintiff as a derivative designee of El Aissami's designation constitute[d] arbitrary and capricious agency action" and exceeded the OFAC's statutory authority. Pl.'s Mem. at 13. He further argues that because he and El Aissami were designated on the same day, El Aissami was not yet a designated person under the Kingpin Act resulting in "[the p]laintiff [being] designated by [the] OFAC on the basis of alleged conduct that was not sanctionable by the plain language of the Kingpin Act." Id. at 19. The defendants respond that the OFAC's decision to designate El Aissami and the plaintiff on the same day "accords with the requirements of the Kingpin Act and the APA[,]" Defs.' Mem. at 22, and the Kingpin Act "impose[s] no [ ] requirement[,]" id. at 21, that El Aissami had to be designated before the plaintiff as a prerequisite for the plaintiff's conduct being sanctionable.

"In addressing a question of statutory interpretation, [a court must] begin with the text." City of Clarksville, Tennessee v. Fed. Energy Regulatory Comm'n, 888 F.3d 477, 482 (D.C. Cir. 2018). Moreover, "[t]he preeminent canon of statutory interpretation requires [the Court] to

presume that [the] legislature says in a statute what it means and means in a statute what it says
there." Janko v. Gates, 741 F.3d 136, 139–40 (D.C. Cir. 2014) (internal quotation marks
omitted).  In reviewing an agency's interpretation of a statute that it administers, the two-step
framework set forth in Chevron U.S.A. Inc. v. Nat. Res. Def. Council, 467 U.S. 837 (1984),
applies.  See Mt. Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754 (D.C. Cir. 2007).
Pursuant to Chevron step one, "if the intent of Congress is clear, the reviewing court must give
effect to that unambiguously expressed intent." Animal Legal Def. Fund v. Perdue, 872 F.3d
602, 610 (D.C. Cir. 2017).  If Congress is silent on the issue, the Court "must proceed to
Chevron step two to determine whether the interpretation proffered by the agency is 'based on a
permissible construction of the statute.'" Am. Fed. Of Gov't Emps., AFL-CIO, Local 3669 v.
Shinseki, 821 F. Supp. 2d 337, 345 (D.D.C. 2011) (quoting Chevron, 467 U.S. at 843).  At this
second step, the Court must defer to agency interpretations that are not defective or arbitrary and
capricious.  See id.

    In making the argument that Congress wrote the Kingpin Act to "requir[e] prior
designation[s] before imposing sanctions on persons providing support and services to
significant foreign narcotics traffickers[,]" Pl.'s Mem. at 20, the plaintiff essentially reads a
temporal requirement into the plain language of the Kingpin Act, see id. at 21, when in fact,
there is no statutory requirement that a narcotics trafficker must be designated before any of his
supporters, rather than as part of a related designation.  See 21 U.S.C. § 1904(b)(2) (requiring
that the specially designated narcotics trafficker pursuant to this section be assisting or
supporting "a significant foreign narcotics trafficker so identified [by the President] . . . or
foreign persons designated by the Secretary of the Treasury pursuant to this subsection").  Thus,
the plain language of the Kingpin Act does not require that El Aissami must have been

designated before the OFAC could designate the plaintiff, and therefore the Court concludes that the OFAC's designation was not arbitrary and capricious.[3]

As part of his argument that the Kingpin Act does not allow for simultaneous designation, the plaintiff also contends that because he and El Aissami were designated simultaneously, there was no sanctionable conduct by the plaintiff at the time of his designation. See Pl.'s Mem. at 13, 19–20.  However, members of this Court and the D.C. Circuit have already rejected the argument that persons cannot be designated based on conduct predating other related designations.  See Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 162 (D.C. Cir. 2003) (rejecting the plaintiff's argument that the Treasury's designation was arbitrary and capricious when it relied on information that predated the designation of Hamas as a terrorist organization because there was no evidence that showed that the ties between the plaintiff and Hamas had been severed); Kadi, 42 F. Supp. 3d at 18–20 (determining that the OFAC could conclude that Kadi provided financial support to terrorists despite the fact that those terrorists had not been designated at the time of Kadi's provision of support).  Generally, the use of such evidence to support designation decisions is permissible when the relationship between the plaintiff and the person or organization it is linked to has not been "severed."  Joumaa, 798 F. App'x at 669 (holding that the OFAC properly considered "evidence of [the plaintiff]'s past illicit business relationships" because there was no evidence that those relationships had been severed at the time of the plaintiff's designation); Islamic Am. Relief Agency, 477 F.3d at 734

---

[3] Moreover, even if the plain language of the statute was ambiguous, the Court must defer to the OFAC's interpretation under Chevron, e.g., a reasonable procedural interpretation that is not arbitrary or capricious.  See Am. Fed. Of Gov't Emps., 821 F. Supp. 2d at 345.  Throughout the Kingpin Act's existence, the OFAC has routinely designated multiple people or entities simultaneously.  See, e.g., Kadi, 42 F. Supp. 3d at 20 ("[Chariq] Ayadi was designated a [specially designated global terrorist] on October 12, 2001 – the same day as [the plaintiff]."); Fares v. Smith, 249 F. Supp. 3d 115, 119 (D.D.C. 2017) (explaining that the OFAC designated multiple people and an entity simultaneously on May 5, 2016); Strait Shipbrokers Pte. Ltd. v. Blinken, 560 F. Supp. 3d 81, 88 (D.D.C. 2021) (noting that the OFAC designated a company and the managing director of that company simultaneously on October 29, 2020).

("A[ person or] entity's 'genesis and history' may properly be considered by [the] OFAC in making the designation or blocking, at least where the ties have not been severed.").  Here, El Aissami <u>was</u> a designated foreign narcotics trafficker, and the plaintiff cites no evidence that even raises a question of fact regarding whether the plaintiff and El Aissami were not still working together at the time of their designations.  <u>See generally</u> Pl.'s Mem. at 12–14. Therefore, the Court concludes that the OFAC's use of evidence of the plaintiff's continued relationship with El Aissami to designate the plaintiff was not arbitrary and capricious, even if the events used as evidence predated their date of designation.

Accordingly, for the foregoing reasons, the Court concludes that the OFAC's decision to designate the plaintiff as a specially designated narcotics trafficker was within the scope of its authority as an agency and was not arbitrary and capricious.  <u>See</u> <u>Zarmach Oil Servs., Inc.</u>, 750 F. Supp. 2d at 154.  The Court must therefore grant the defendants' motion to dismiss as to the plaintiff's APA claims.

**B.     The Plaintiff's Constitutional Claims**

The Court next turns to the plaintiff's Constitutional claims.  Regarding the plaintiff's Fifth Amendment claim, he first argues that the OFAC's designation violated his Fifth Amendment due process right "by failing to provide him fair notice of conduct that would subject him to sanctions under the Kingpin Act[,]" <u>id.</u> at 25, specifically, that the "simultaneous designation of El Aissami and [the plaintiff] violated his due process rights . . . by failing to provide fair notice of conduct that was sanctionable under the Kingpin Act[,]" <u>id.</u> at 32.  Second, the plaintiff argues that the OFAC violated his Fifth Amendment rights by "failing to provide him with adequate notice of the reasons for his designation under the Kingpin Act."  <u>Id.</u> at 34.  In response, the defendants argue that: (1) a "pre-deprivation notice is not required in the context of

[the] OFAC's sanctions actions," Defs.' Mem. at 25, and the Kingpin Act and the OFAC

"unambiguously set forth the relevant standard of conduct that can result in [the] designation,"

id. at 26; and (2) the evidence provided to the plaintiff "more than satisfies due process" because

it apprises him "of the government's view regarding the basis for his designation," allowing him

to meaningfully challenge his designation using the procedures provided to him by the Kingpin

Act, id. at 41 (alterations omitted).

 Regarding the plaintiff's Fourth Amendment claim, he argues that the OFAC violated his

Fourth Amendment rights because the blocking of his United States property "effect[uated] a

seizure of [the p]laintiff's property[.]"  Pl.'s Mem. at 41.  In response, the defendants argue that

the plaintiff cannot establish that the OFAC's blocking of his property "constitute[d] an unlawful

seizure of" the plaintiff's property.  Defs.' Mem. at 32.  Further, the defendants argue that

"[e]ven if [the] OFAC's [d]ecision [to block the plaintiff's property did] [c]onstitute[] [a]

[s]eizure, [i]t [w]as [r]easonable[.]"  Id. at 35.

 Furthermore, as a threshold matter, the defendants argue that the plaintiff cannot assert

constitutional rights as a foreign national "without substantial contacts with the United States[.]"

Id. at 2, 22.  By contrast, the plaintiff argues that he "meets the threshold by which non-citizens

develop substantial contacts" in the United States, affording him constitutional protection despite

being a foreign national.  Pl.'s Mem. at 28.  Because this question must be addressed before the

Court can assess whether a constitutional violation occurred, the Court will first consider

whether the plaintiff can assert constitutional rights violations, before turning to the plaintiff's

Fifth and Fourth Amendment challenges.

 **1.  Whether the Plaintiff May Assert Constitutional Rights Violations**

 The defendants first argue that the plaintiff cannot assert constitutional rights violations

because he is a "foreign person without substantial contacts with the United States[.]"  Defs.'

Mem. at 2, 22, 30.  In response, the plaintiff argues that "there can be no question that [he] meets the threshold by which non-citizens develop substantial contacts to the United States deserving of constitutional protection."  Pl.'s Mem. at 28.

"The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections[,]" Jifry v. Fed. Aviation Admin., 370 F.3d 1174, 1182 (D.C. Cir. 2004), and "non[-]resident aliens . . . [are] not among 'the people' protected by the Fourth Amendment," Rasul v. Myers, 563 F.3d 527, 533 (D.C. Cir. 2009) (citing United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990)).  "Aliens who have 'come within the territory of the United States and developed substantial connections with this country,' by contrast are entitled to constitutional protections."  Al-Aqeel v. Paulson, 568 F. Supp. 2d 64, 69 (D.D.C. 2008) (quoting Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 201 (D.C. Cir. 2001)).  Non-citizens may also be able to assert constitutional rights when they have accepted "some societal obligations" in the United States.  Jifry, 370 F.3d at 1182–83.

This Circuit "has no test to determine what degree of connection to the United States counts as 'substantial.'"  Bazzi v. Gacki, 468 F. Supp. 3d 70, 77 (D.D.C. 2020).  It is clear, however, that "'[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise.'"  People's Mojahedin Org. of Iran v. United States Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) (emphasis added); see also Fulmen Co., 547 F. Supp. 3d at 21 (holding that the plaintiff could not assert a constitutional claim because it admittedly had no connections to any person or entity in the United States) Bazzi, 468 F. Supp. 3d at 77 (applying this standard to a person, not an "entity").  However, no case in this Circuit has set a bar for what level of connection to the United States qualifies as

"substantial," Bazzi, 468 F. Supp. 3d at 77, suggesting rather that this question requires a fact-based assessment.  See, e.g., Nat'l Council of Resistance of Iran, 251 F.3d at 201 (reviewing the record as a whole to find that two Iranian organizations could bring a due process challenge because they had an "overt presence within the National Press Building" in Washington, D.C., and an interest in a small bank account).  Moreover, "[t]he D.C. Circuit has also held within the context of an OFAC sanctions case[,] that presence in the United States or substantial property interests are necessary to warrant [the assertion of] due process rights."  Hejeij, 2020 WL 5545555, at *7.  A plaintiff's "failure to identify [ ] example[s]" of specific property interests "permits the Court to find no substantial connections exist to warrant due process protections." Id. (holding that the plaintiff could not assert constitutional rights because, although he asserted that the OFAC had blocked his United States properties, he "offer[ed] no specific examples of property or other interests [of his] located within the United States").

Here, the plaintiff has established the requisite "substantial connections" necessary to assert constitutional claims, despite the fact that he is not a United States citizen.  See Pl.'s Mem. at 29; Pl.'s Reply at 11.  Several factors advanced by the plaintiff support this position.  For example, the plaintiff asserts that at the time of his designation, "[he] held two U.S. visas[,] . . . maintained a residence in the United States[,] and owned and operated multiple companies in the United States."  Am. Compl. ¶ 11; see Defs.' Mem. at 24 (conceding the fact that the plaintiff owns property in the United States).  The plaintiff also claims that he has property interests in several United States properties blocked by the OFAC as a result of the designation, including "U.S. companies alleged to be owned or controlled by [him], a U.S.-registered aircraft in which [he] allegedly retained an interest, and several U.S.-based real properties and other U.S. assets—including vessels and automobiles—in which [he] exercised ownership or control."  Am. Compl.

¶ 23; see id. ¶¶ 17, 25–26, 86; cf. Hejeij, 2020 WL 5545555, at *7 (concluding that the plaintiff's failure to assert his interest in United States properties precluded his ability to raise constitutional claims). Moreover, the plaintiff contends that he "resided . . . [in] Coral Gables, F[lorida,]" "two of [his] minor children are U.S. citizens[,]" and "his wife was also [a U.S.] resident under a 'temporary worker' visa." Am. Compl. ¶ 121.

    As noted above, determining whether a foreign national has "substantial" contacts within the United States is a heavily fact-based inquiry, and considering the record before the Court, the defendants' arguments that the plaintiff should not be able to assert constitutional rights are unpersuasive. To this point, in their motion, the defendants do not challenge the plaintiff's asserted property and personal presence in the United States. See generally Defs.' Mem. Instead, the defendants simply maintain, without any factual support, that the defendant's connections to the United States are not "substantial." See id. at 23–24. That being the extent of their retort and for the reasons advanced by the plaintiff, the Court concludes that, although the plaintiff is not a United States citizen, he has asserted "substantial" connections to the United States through his property interest and personal and familial presence in the United States and therefore can assert rights provided by the Constitution.[4]

---

[4] The defendants argue that the standard for asserting Fifth Amendment rights is different than that required to assert Fourth Amendment rights. See Defs.' Mem. at 30. However, the Court notes that the case heavily relied upon by the defendants in explaining why the plaintiff cannot assert his Fifth Amendment right is actually a Fourth Amendment case. See id. at 23; Verdugo-Urquidez, 494 U.S. at 261 (holding that the Fourth Amendment had no application to the respondent when he was a citizen and resident of Mexico without a voluntary connection to the United States). Nonetheless, the defendants invoke Verdugo-Urquidez for the proposition that the Fourth Amendment does not "apply to activities of the United States directed against aliens in foreign territory or in international waters[,]" Verdugo-Urquidez, 494 U.S. at 267. See Defs.' Mem. at 30. Even if the Court could accept this as the proper standard to apply in assessing the plaintiff's ability to assert a Fourth Amendment claim, the factual circumstances here are distinct from those in Verdugo-Urquidez. Here, the plaintiff is not asserting that the United States unlawfully seized his properties outside of the United States; rather, he only takes issue with his properties located in the United States and seeks to assert his Fourth Amendment rights based on the blocking of those properties. See Pl.'s Mem. at 42.

## 2.   The Plaintiff's Fifth Amendment Claim

### a.   Whether the Defendants Provided Adequate Notice of Prohibited Conduct

Having concluded that the plaintiff may assert that his constitutional rights were violated, the Court turns to the merits of the plaintiff's Fifth Amendment claim.  The plaintiff first argues that the defendants were required to, and failed to, "provide him fair notice of conduct that would subject him to sanctions under the Kingpin Act."  Pl.'s Mem. at 25.  In response, the defendants argue that "pre-deprivation notice is not required in the context of [the] OFAC's sanctions actions[.]"  Defs.' Mem. at 25.

Fair notice is often required in the agency context, the standard for the triggering of this requirement being that a statute may not be "impermissibly vague" and that it must "provide a person of ordinary intelligence fair notice of what is prohibited[.]"  Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012) (quoting United States v. Williams, 553 U.S. 285, 304 (2008)).  However, in Calero-Toledo v. Pearson Yacht Leasing Company, the Supreme Court explained that in some situations, a lack of advance notice does not result in a denial of due process.  See 416 U.S. 663, 678–80 (1974), superseded by statute on other grounds, 18 U.S.C. § 981 ("[F]or example, due process is not denied when postponement of notice and hearing is necessary to protect the public from contaminated food, from bank failure, [ ] from misbranded drugs, [ ] to aid the collection of taxes, or the war effort." (internal citations omitted)).  The government must satisfy three requirements in order to show that it was not required to provide notice before taking the challenged action: (1) the deprivation was "necessary to secure an important governmental interest;" (2) there was a "special need for very prompt action;" and (3) "the party initiating the deprivation was a governmental official responsible for determining, under the standards[] of a narrowly drawn statute, that it was

necessary and justified in the particular instance." Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57, 76 (D.D.C. 2002) (citing Calero-Toledo, 416 U.S. at 678–80).

Here, the plaintiff's argument that his simultaneous designation along with El Aissami did not provide him with fair notice of the sanctionable conduct under the Kingpin Act essentially requests pre-designation notice, see Pl.'s Mem. at 25–26, an argument that has already been rejected in several similar cases in this Circuit. Specifically, under both the IEEPA and the Kingpin Act, the OFAC "need not provide pre-deprivation notice and hearing, given the government's compelling interest in the immediate blocking of assets upon designation." Zevallos, 10 F. Supp. 3d at 127 (emphasis added) (concluding that advance notice is not required for blocking actions under the Kingpin Act just as it is not required under the IEEPA); see also Holy Land Found. for Relief & Dev., 219 F. Supp. 2d at 76 (determining that advance notice was not required before a blocking action under the IEEPA because (1) "the [blocking action] was necessary to secure an important governmental interest" (2) "there [was] a special need for very prompt action;" and (3) "the party initiating the deprivation was a government official responsible for determining . . . that it was necessary and justified in the particular instance"). In fact, the D.C. Circuit has held that due process is satisfied in cases involving designation by the OFAC by "the provision of a post-deprivation administrative remedy and the opportunity to submit written submissions to [the] OFAC[,]" Kadi, 42 F. Supp. 3d at 29; see Holy Land Found. for Relief & Dev., 333 F.3d at 164 (expressly rejecting the notion that pre-deprivation notice of any kind is required in order to provide due process to designated individuals or individuals whose property has been blocked by the OFAC). See Holy Land Found. for Relief & Dev., 333 F.3d at 164 (concluding that the defendant agency had "provided [the plaintiff] with the requisite notice and opportunity for response necessary to satisfy due process requirements" where "[the

plaintiff] was given thirty-one days to respond to [its] redesignation and [ ] new evidence"
produced by the defendant).  Moreover, this Court and other members of this Court have
routinely rejected the contention that a plaintiff's procedural due process rights are violated when
pre-deprivation notice was not provided.  See, e.g., Zevallos, 10 F. Supp. 3d. at 127–28; Islamic
Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp. 2d 34, 49–50 (D.D.C. 2005); Holy
Land Found. for Relief & Dev., 333 F.3d at 163–64.[5]

Here, because the OFAC "need not provide pre-deprivation notice and [a] hearing[,]"
Zevallos, 10 F. Supp. 3d at 127, , and where "the government s[ought] to further its compelling
national security and foreign policy interests while minimizing the potential for asset flight[,]"
Defs.' Mem. at 25 (citing Zevallos, 793 F.3d at 116), the Court concludes that the OFAC did not
violate the plaintiff's due process rights by not providing him with pre-designation notice.  The
OFAC, a governmental entity that initiated the deprivation in this case, Holy Land Found. for
Relief & Dev., 219 F. Supp. 2d at 76 (requiring that "the party initiating the deprivation was a
government official responsible for determining . . . that it was necessary and justified in the
particular instance"), has articulated reasoning sufficient to show that "the [blocking action] was
necessary to secure an important governmental interest[,]" id.; see Defs.' Mem. at 25 (stating
that, in designating the plaintiff as a specially designated narcotics trafficker, "the government
s[ought] to further its compelling national security and foreign policy interests"), and that "there
[was] a special need for very prompt action[,]" Holy Land Found. for Relief & Dev., 219 F.

---

[5] Important policy considerations underlie decision by the courts and the Executive Branch that pre-deprivation
notice is not required in this context.  Executive Order 13,224, the direct predecessor to the IEEPA and eventually
the Kingpin Act, explicitly notes that prior notice to individuals that measures shall be taken to block assets or
designate individuals would "render th[o]se measures ineffectual" due to the "ability to transfer funds or assets
instantaneously."  Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001); see also Zevallos, 10 F. Supp. 3d
at 128 (explaining, pursuant to the Calero-Toledo factors, that no pre-deprivation notice is required so the OFAC can
take quick action to prevent asset flight).

Supp. 2d at 76; <u>see</u> Defs.' Mem. at 25 (citing the need to "minimiz[e] the potential for asset flight").  Due process required nothing more.

> **b.**   **Whether the OFAC's Interpretation of the Kingpin Act Violated the Plaintiff's Due Process Right**

The plaintiff next argues that the OFAC's "simultaneous designation of El Aissami and [the plaintiff] violated his due process rights under the Fifth Amendment by failing to provide fair notice of conduct that was sanctionable under the Kingpin Act."  Pl.'s Mem. at 32.  The defendants argue in response that "both the Kingpin Act and [the] OFAC's regulation unambiguously set forth the relevant standard of conduct that can result in designation," Defs.' Mem. at 26, and that the OFAC has "provided the public consistent notice[,]" <u>id.</u> at 27, that it interprets the Kingpin Act as permitting simultaneous designations.  As the Court has previously concluded, <u>see</u> <u>supra</u> Section III.A.2, the OFAC's interpretation of the Kingpin Act's allowance for simultaneous designation is reasonable and therefore, the plaintiff's designation did not deprive him of his rights under the APA, nor under the Fifth Amendment.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Gen. Elec. Co. v. Envtl. Prot. Agency</u>, 53 F.3d 1324, 1327 (D.C. Cir. 1995) (considering the EPA's interpretation of its regulation in the context of both the APA and the Constitution to determine whether the regulated class had fair notice of the interpretation).  Furthermore, courts "accord an agency's interpretation of its own regulations a 'high level of deference,' accepting it 'unless it is plainly wrong.'"  <u>See</u> <u>Gen. Elec. Co.</u>, 53 F.3d at 1327 (quoting <u>Gen. Carbon Co. v. Occupational Safety & Health Review Comm'n</u>, 860 F.2d 479, 483 (D.C. Cir. 1988)); <u>supra</u> Section III.A.2.

The plaintiff argues that there was no "conduct made sanctionable" at the time of the plaintiff's designation because El Aissami had not been designated at that time.  <u>See</u> Pl.'s Mem. at 26.  In other words, the plaintiff contends that he had not "provid[ed] material assistance" to a designated person because El Aissami had not previously been so designated.  <u>See</u> <u>id</u>; 21 U.S.C.

§ 1904(b)(2).  However, as stated above, the Court accepts the agency's interpretation—that simultaneous designations statutorily permissible.  <u>See</u> <u>supra</u> Section III.A.2.  Not only is it a reasonable interpretation based upon the plain language of the statute, <u>see</u> 21 U.S.C. § 1904(b), but it also comports with the policy reasons underlying the adoption of the Kingpin Act and its predecessor, <u>see</u> Defs.' Opp'n at 24.  Namely, concerns about concealment, dispossession, and asset flight lend themselves to a reading of the Kingpin Act free of temporal constraints.  <u>See</u> <u>id.</u> at 24–25 (stating that any potential requirement to "notify[] the kingpin that the agency viewed his conduct as sanctionable under the statute" prior to designation of an individual who provided material assistance to the kingpin "would undoubtedly lead to asset flight, and would defeat the central purpose of the statute, namely dismantling drug trafficking operations through coordinated actions against the kingpin and his supporters and frontmen").

The plaintiff further argues that the defendant's interpretation of the Kingpin Act deprives him of fair notice by not providing "adequate notice of the substance of the [law]." Pl.'s Mem. at 30 (quoting <u>Howmet Corp. v. Envtl. Prot. Agency</u>, 614 F.3d 544, 553 (D.C. Cir. 2010)).  An agency has provided parties potentially subject to designation fair notice of the agency's interpretation of a regulation "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty," the conduct required of it.  <u>Gen. Elec. Co.</u>, 53 F.3d at 1329 (internal quotation marks omitted).  And, the OFAC has satisfied its notice obligation here based on its "public statements" and other interactions with the public prior to the plaintiff's designation.  <u>See, e.g.</u>, 81 Fed. Reg. 68,500 (Oct. 4, 2016) (providing notice that the OFAC designated six individuals and six entities simultaneously).

Indeed, the Executive Branch has made clear that it can and will designate multiple specially designated nationals simultaneously.  See, e.g., Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001).  Since the first designation under the Kingpin Act, the OFAC has continuously provided notice to the public that it may exercise simultaneous designation.  See Letter to Congressional Leaders Reporting on Sanctions Under the Foreign Narcotics Kingpin Designation Act from President William J. Clinton (June 1, 2000) (on file with the United States Government Publishing Office) (designating twelve individuals pursuant to the Kingpin Act in one order); see also supra Section III.A.2.  Not only have members of this Court routinely upheld simultaneous designations, see, e.g., Kadi, 42 F. Supp. 3d at 20; Fares v. Smith, 249 F. Supp. 3d 115, 119 (D.D.C. 2017), but the OFAC also has consistently published its designation decisions online and in the Federal Register, thereby providing readily available public access to the OFAC prior designations of multiple people and/or entities in one action.  See, e.g., 81 Fed. Reg. 68,500 (Oct. 4, 2016) (providing notice that the OFAC designated six individuals and six entities simultaneously); Specially Designated Nationals And Blocked Persons List (SDN) Human Readable Lists, United States Department of the Treasury (last updated Oct. 26, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-and-blocked-persons-list-sdn-human-readable-lists.  The plaintiff needed to only conduct a search of the Treasury Department's website or the Federal Register to view the OFAC's "public statements" indicating the frequency with which simultaneous designations occur, thereby putting the plaintiff on notice of the possibility that, based on years of consistent action by the OFAC, he could be simultaneously designated with El Aissami for materially assisting El Aissami.  See Gen. Elec. Co., 53 F.3d at 1329 ("If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify,

with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation.").  Accordingly, the Court concludes that the defendants provided adequate notice of sanctionable conduct under the Kingpin Act and of its interpretation that the Act permits simultaneous designations, and therefore, the plaintiff's Fifth Amendment rights were not violated for these reasons.

### c.   Whether the Defendants Provided Adequate Notice of the Reasons for its Decision

The plaintiff next contends that the OFAC "fail[ed] to provide him with adequate notice of the reasons for his designation under the Kingpin Act[,]" in violation of the Fifth Amendment. See Pl.'s Mem. at 34.  The plaintiff argues that the OFAC provided unsatisfactory evidence when the plaintiff, per Kingpin Act procedures, requested the record and evidence that the OFAC relied on in making its designation decision.  See id. at 34–37.  The defendants argue that by providing the plaintiff with "the redacted administrative record, press release, press chart, Federal Register notice, and unclassified and non-privileged summaries of otherwise protected information," the OFAC "has provided [the p]laintiff with sufficient notice of the agency's fact findings underlying its designation decision."  Defs.' Mem. at 40.

Regarding a plaintiff's procedural opportunities for post-designation redress and standards of notice that comport with due process, "notice and a meaningful opportunity to be heard are satisfied by providing a post-deprivation administrative remedy and the opportunity to submit written submissions to [the] OFAC, even where . . . the initial designation provided no notice or opportunity to be heard."  Kadi, 42 F. Supp. 3d at 29.  A plaintiff is afforded sufficient post-designation due process when the plaintiff receives "unclassified evidence on which [the OFAC] relied to designate him" and the plaintiff is able to "contest[] his designation by filing [ ] delisting requests."  Zevallos v. Obama, 793 F.3d 106, 117 (D.C. Cir. 2015).  Moreover, as stated

above, when considering the evidence that the OFAC provided to a plaintiff regarding his designation, courts consider this evidence as a whole, rather than reviewing the sufficiency of individual pieces of evidence.  Kadi, 42 F. Supp. 3d. at 17, 23 (noting that the Court makes its findings regarding designation procedures by viewing all the evidence as a whole).  Furthermore, the OFAC may rely on a broad range of evidence to support its designation decisions.  See Holy Land Found. for Relief & Dev., 333 F.3d at 162 ("[I]t is clear that the government may decide to designate a[ person or] entity based on a broad range of evidence, including intelligence data and hearsay declarations.").

Here, pursuant to the plaintiff's request, the OFAC provided the plaintiff with the redacted administrative record upon which the OFAC relied in designating the plaintiff, as well as the press release, and multiple unclassified summaries of the classified information from the redacted record.  See Am. Compl. ¶¶ 28–32, 74–75; Defs.' Mem. at 8.  Viewed as a whole, the Court concludes, for the following reasons, that the evidence disclosed to the plaintiff regarding the circumstances of his designation were sufficient and did not deprive him of fair notice or a meaningful opportunity to be heard.

First, the OFAC published a notice of the designation in the Federal Register, Defs.' Mem. at 40, which constitutes "more than ample" notice of agency action.  Lyng v. Payne, 476 U.S. 926, 942 (1986); 44 U.S.C. § 1507 (stating that publication in the Federal Register is "sufficient to give notice of the contents of the document to a person subject to or affected by it").  Moreover, the OFAC publishes press releases on its website informing the public of designations and did so here regarding the plaintiff's designation.  See Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello, Press Releases, U.S. Department of the Treasury (February 13, 2017),

https://home.treasury.gov/news/press-releases/as0005; Defs.' Mem. at 40.  And press releases

have also been considered "sufficiently detailed" summaries to satisfy the notice standard when

they adequately explain the OFAC's reasons to designate a plaintiff, Bazzi, 468 F. Supp. 3d at

78, which is the case here, see Treasury Sanctions Prominent Venezuelan Drug Trafficker

Tareck El Aissami and His Primary Frontman Samark Lopez Bello, Press Releases, U.S.

Department of the Treasury (February 13, 2017), https://home.treasury.gov/news/press-

releases/as0005

      Next, the OFAC provided the plaintiff with unclassified summaries of the information

that was classified in the redacted administrative record.  See Am. Compl. ¶¶ 27–30; Defs.'

Mem. at 8.  Other members of this Court have determined that one means of adequate post-

deprivation notice is for the OFAC to provide a plaintiff with an unclassified summary of the

record or to disclose unclassified portions of the record.  See Zevallos, 10 F. Supp. 3d at 129; see

also Fares, 249 F. Supp. 3d at 123 ("[D]ue process requires the disclosure of only the

unclassified portions of the administrative record, and consequently, [the] plaintiff's contention

that due process prevents its designation based upon classified information to which it has not

had access is of no avail."  (internal quotation marks omitted)).  Although unredacted portions of

a classified administrative record made available to the plaintiff alone may not be sufficient to

provide fair notice to the plaintiff of the reasons for his designation, unredacted portions of the

administrative record paired with unclassified summaries can be sufficient to give the plaintiff

meaningful information about his designation.  See Fares, 249 F. Supp. 3d at 128 (determining

that the "redacted administrative record" combined with "additional information by means of

two unredacted summaries of otherwise privileged information" provided to the plaintiff with

sufficient notice that the OFAC viewed the plaintiff as a principal member of a large money

laundering organization (internal quotation marks omitted)).  Here, while the heavily redacted administrative record alone might not have been sufficient for the plaintiff to understand why the OFAC had designated him, the unclassified summaries included information that indicated the OFAC's knowledge that the plaintiff acted as a "business representative, money manager, and money launderer for El Aissami."  Defs.' Mem. at 41 (internal quotation marks omitted). Recognizing that the Court's review is deferential to the OFAC based on the national security and foreign policy interests involved, see Zarmach Oil Servs., Inc., 750 F. Supp. 2d at 155, the Court concludes that the combination of the redacted record, press release, and unclassified summaries provided the plaintiff with adequate notice of the reasons why the OFAC considers him as "materially assisting" or "providing . . . support to" El Aissami in his narcotics trafficking and money laundering conduct, and consequently, the reasons that the OFAC designated the plaintiff.  Fares, 249 F. Supp. 3d at 127; see 21 U.S.C. § 1904(b)(2); Defs.' Mem. at 40. Therefore, viewing the evidence as a whole, the Court concludes that the disclosures provided to the plaintiff provided him sufficient notice for him to comprehend the basis for and meaningfully challenge his designation and therefore the plaintiff's due process rights were not violated.

For all of the foregoing reasons, the Court grants the defendants' motion to dismiss all of the plaintiff's Fifth Amendment claims.

### 3.  The Plaintiff's Fourth Amendment Claim

The Court next turns to the plaintiff's Fourth Amendment claim.  The plaintiff argues that the OFAC's blocking of his United States property "effect[uated] a seizure of [the p]laintiff's property" in violation of the Fourth Amendment.  Pl.'s Mem. at 41.  On the other hand, the defendants argue that the plaintiff cannot establish that the OFAC's blocking of his property "constitute[d] an unlawful seizure of [the plaintiff's] U.S. properties."  Defs.' Mem. at 32.

Further, the defendants argue that even if the blocking <u>did</u> constitute a seizure, it was reasonable.
<u>See</u> <u>id.</u> at 35.

The Fourth Amendment protects against "unreasonable searches and seizures[.]"  U.S.
Const. amend. IV.  A "seizure" of property occurs when there has been "some meaningful
interference with an individual's possessory interests in that property."  <u>United States v. Karo</u>,
468 U.S. 705, 712 (1984) (internal quotation marks omitted).  However, the IEEPA and the
Kingpin Act plainly grant the government authority to issue blocking actions against designated
persons' property interests, and other members of this Court have refused many times to consider
such blocking actions as "seizures."  <u>See, e.g.</u>, <u>Holy Land Found. for Relief & Dev.</u>, 219 F.
Supp. 2d at 78–79 ("The government plainly had the authority to issue the blocking order . . . .
Further, the case law is clear that a blocking of this nature does not constitute a seizure.");
<u>Zarmach Oil Servs., Inc.</u>, 750 F. Supp. 2d at 160 (same).

While the plaintiff is correct that courts in this Circuit have been reluctant to conclusively
say that blocking actions can <u>never</u> constitute seizures, <u>see</u> Pl.'s Mem. at 43 ("[T]he D.C. Circuit
has remained agnostic over whether an OFAC blocking constitutes a 'seizure' within the
meaning of the Fourth Amendment."); <u>see also</u> <u>Kadi</u>, 42 F. Supp. 3d at 37 ("This Court, as well,
has expressed some reluctance to find that, categorically, blocking orders could <u>never</u> be
'seizures' under the Fourth Amendment."), the factual circumstances here mirror similar cases in
which this Court and other members of this Court have found the Fourth Amendment
inapplicable.  <u>See, e.g.</u>, <u>Holy Land Found. for Relief & Dev.</u>, 219 F. Supp. 2d at 78–79
(concluding that physical "entry into [the plaintiff's] offices, search of its property, and seizure
of its documents and office equipment" violated the plaintiff's Fourth Amendment rights, but
freezing the plaintiff's assets did not).  Here, pursuant to its statutory authority, the OFAC

blocked access to the plaintiff's properties and interests in property located in the United States, see Am. Compl. ¶¶ 23–26, an action comparable to "the freezing of [ ] accounts[,]" Holy Land Found. for Relief & Dev., 219 F. Supp. 2d at 79, which was deemed "not a seizure entitled to Fourth Amendment protection[,]" id. "However, the Court need not resolve the issue [of whether what happened in this case constituted a seizure], nor need decide as a general matter whether blocking orders categorically fall within one of the enumerated exceptions to the Fourth Amendment warrant requirement." Kadi, 42 F. Supp. 3d at 37. Even if the blocking at issue here were considered to constitute a seizure, "having already concluded above that OFAC's [designation] decision . . . was supported by substantial evidence, it follows that the blocking order was not issued unreasonably or without probable cause." Kadi, 42 F. Supp. 3d at 37; see supra Section III.A. Where, as in this case, "[t]he [g]overnment plainly had the authority to issue the blocking order pursuant to the IEEPA and the Executive Orders and the Court has determined that its actions were not arbitrary and capricious[,]" "OFAC's blocking of . . . assets does not create a cognizable claim under the Fourth Amendment." Islamic Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp. 2d at 48. Accordingly, for the foregoing reasons, the Court concludes that the plaintiff's Fourth Amendment rights were not violated and will therefore grant the defendants' motion to dismiss as to the plaintiff's Fourth Amendment claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendants' motion and deny as moot the plaintiff's cross-motion. The defendants' motion is granted to the extent that it seeks dismissal pursuant to Rule 12(b)(6) and denied in all other respects.

**SO ORDERED** this 21st day of December, 2022.[6]

REGGIE B. WALTON
United States District Judge

---

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.